AIPLE-HEMMELMANN REAL ESTATE COMPANY v. LOUIS SPELBRINK, Appellant.

In Banc, May 13, 1908.

1. **CONTRACT: Option on Real Estate: Signed by Both Parties.** A mere option by the owner of land to sell it at a definite sum to "the party of the second part," and requiring the second party to do nothing except to pay for the land within the life of the option, is valid without the signature of the holder of the option. It is a unilateral agreement, though it names the purchaser of the option as "the party of the second part."

2. ——: ——: **Specific Performance.** A court of equity will specifically enforce a unilateral written contract for the sale of land, based upon a valuable consideration (in this case $50 for an option for forty-five days on $20,000 worth of land), unless there are facts and circumstances connected with the transaction that would render it unjust and inequitable to enforce it.

Real Estate Co. v. Spelbrink.

3. **SPECIFIC PERFORMANCE:** Covenant for Warranty Deed: Wife's Refusal: Fraud. Specific performance of a written contract to sell land, agreeing to deliver to the vendee upon payment of the purchase money a warranty deed, and covenanting that the title shall be perfect and free from all encumbrances, liens and adverse titles, signed alone by the vendor, a married man, whose wife refuses to join in the deed, will not be decreed, where there is no proof of fraud on his part in her refusal, unless the purchaser is willing to pay the full purchase money and accept the deed without her joining.

*Held*, by LAMM, J., in a dissenting opinion, in which FOX and GRAVES, JJ., concur, first, that there are two fundamental and solid rules in specific performance: (a) A purchaser of real estate under a contract, honest, fair, free from covin, overreaching or misuse of a trust relation, definite in terms and not obnoxious to the Statute of Frauds, is entitled of right to performance; (b) being entitled to performance and the vendor refusing to perform, such purchaser is entitled under clear equity to elect to accept that which is in the power of the vendor to give and further for compensation for so much as the vendor has it not in his power to give. *Held*, second, there is nothing so singular about inchoate, dower as takes it out of the general rule and puts up the bars to full equitable relief by performance in kind so far as possible, and by compensation for the part not performed. *Held*, third, specific performance ought to require no aid from the doctrines of fraud. The equity in favor of the vendee is not administered as a punishment for fraud in the vendor and if specific performance and compensation are allowed where the wife's refusal is due to the vending husband's fraud, so ought it to be decreed in case of other frauds—such as stubbornness or rise in prices.

4. ———: ———: ———: Abatement. Nor will the court undertake to compute the value of the wife's inchoate dower, and abate the agreed purchase price by that much, and decree that upon the payment of the balance the vendor shall execute a deed conveying the land free from all liens and claims except his wife's inchoate dower.

*Held*, by LAMM, J., dissenting, that specific performance should be decreed, with an abatement from the purchase price of the value of the outstanding inchoate right of dower.

5. ———: ———: ———: ———: Coercing Wife. A court of equity will not lend its aid, directly or indirectly, to coerce a wife to relinquish her inchoate right of dower, in face of the statute which expressly provides that the relinquishment of her dower rights shall be her free act and deed. And to withhold the payment of a considerable portion of the agreed purchase price during the life of the wife, because she refused to

Real Estate Co. v. Spelbrink.

join her husband in the conveyance, or to subject him to an action for compensatory damages, would be an indirect method of compelling her to release her dower contrary to her own free volition.

*Held*, by LAMM, J., dissenting, that to abate the agreed purchase price by the value of the outstanding inchoate dower, is not to coerce the wife to surrender her dower. She will still have her wifely interest in her husband's real estate, and it will become consummate on his death. Besides, those early cases, holding that a wife by such abatement would be induced to sign the deed rather than see her husband imprisoned for failure to pay damages awarded, are no longer applicable, for no court of equity now would clap the husband in jail if he did not within a fixed time present a deed signed by his wife.

6. ———: ———: ———: **Dower Not Embraced in Contract: Damages.** The vendor by his sole contract to deliver a warranty deed to the purchaser and covenanting that the title should be free from all liens and adverse claims, did not covenant that his wife would sign the deed, and the purchaser in asking that the value of her inchoate dower be abated from the agreed price asks for more than his contract calls for. If he knew at the time the contract was executed that the vendor was married, he knew that the vendor's wife had inchoate dower in the premises, and he accepted the contract subject to her right to refuse to sign the deed. And if she refuses to sign, his remedy is to refuse to pay the purchase price and sue for compensatory damages for a breach of the contract, or to accept the vendor's warranty deed and, if the wife's inchoate dower ever becomes consummate and he is evicted, to sue the vendor's estate for a breach of his warranty.

*Held*, by LAMM, J., dissenting, that the evidence does not show that the vendee knew that the contracting vendor was married, nor is the vendee's knowledge of the vendor's coverture a turning or vital matter in determining the vendee's right to have the agreed purchase price abated by the value of the inchoate dower of vendor's wife. *Held*, also, that by the contract the husband agreed to deliver a deed conveying a title free from all liens and claims, and to say that the vendee shall take what the vendor can give, which is less than he agreed to give, is not to do equity, but inequity.

7. ———: ———: ———: **Abatement of Dower Not Pleaded.** Where the petition in a suit for the specific performance of a contract to sell land, signed by the husband alone, is drawn on the theory of enforcing the contract against the vendor irrespective of the wife's interest in the land, there is no basis for

211 Sup.—43

considering the value of her inchoate dower and of deducting the value thereof from the agreed purchase price, and a decree which adjudges such abatement is not responsive to the pleadings.    [LAMM, J., dissenting.]

8.   ———: **Dual Agency.**  A decree for specific performance will not be denied on the ground that the plaintiff was agent for both the vendor and the vendee, where it is shown by the option contract and by the evidence that the plaintiff was the agent of the real vendee and that the vendor knew he was purchasing for another.

9.   **DOWER: Estimate of Value: Mortality Tables.**    There is no just scale, through mortality tables or otherwise, by which the value of inchoate dower may be estimated.    The statute (Laws 1905, p. 139) in fixing a mortality table for estimating the value of estates "for life, or by curtesy, or in dower," refers to an estate consummate, not an indefinite and shadowy expectancy.

*Held*, by LAMM, J., dissenting, that the value of the inchoate dower can be computed with as much accuracy by way of compensation in the specific performance case, as it can by way of damages in a suit for breach of the contract to convey a perfect title; and, mortality tables, while not an exact measure, are as nearly so as men have been able to devise, and being the best evidence of which the case is susceptible, should be received and acted upon.

Appeal from St. Louis County Circuit Court.—*Hon. Jno. W. McElhinney*, Judge.

REVERSED AND REMANDED (*with directions*).

` R. M. Nichols` for appellant.

` (1)`    The testimony shows that it was the intention of the parties to reduce the contract shown in evidence to writing, and sign the same "in triplicate," and the written instrument shows upon its face that it was to be executed "in triplicate" before being binding upon either, and until so executed, it was inchoate; it was not admissible in evidence for any purpose, not even against the party executing it, and the objection to it should have been sustained.  Greene v. Cole, 103 Mo. 70; Crane v. Portland, 9 Mich. 493; Waggermann v. Bracken, 52 Ill. 468; Miss. & D. S. S. Co. v. Swift, 86

Me. 248; Arnold v. Scharbauer, 116 Fed. 493; Goode-now v. Gunn, 21 Me. 91; Barber v. Burrows, 51 Cal. 404; Mattoon v. Barnes, 112 Mass. 463; Wilcox v. Saunders, 4 Neb. 569; Hodges v. Sublette, 91 Ala. 588; Vastbinder v. Metcalfe, 3 Ala. 100; Wettenkamp v. Billigh, 27 Ill. App. 585; Williamson v. Heavenrich, 58 Mich. 579; Stensgard v. Smith, 43 Minn. 11; Osborn v. Holland, 11 Tex. App. 1087; Keating v. Nelson, 33 Ill. App. 557; Howard v. Carpenter, 11 Md. 259. (2) The contract being inchoate, without the plaintiff's signature, Spelbrink had a right to withdraw therefrom and return the check. Plaintiff's failure to sign the contract, which provided for the execution "in triplicate," was a breach of the oral agreement, of which the writing was intended as a consummation. Bloeker v. Tillman, 4 La. 77; Villere v. Brogaur, 3 Martin (La.) 349. (3) Specific performance of contracts unilateral in form is granted because it was the intention of the parties to create a unilateral instrument, but where a contract is of such a form and nature that it contains mutual executory promises, or where it is intended that it shall require future acts or omissions from each of the parties, and that each should be bound to such acts or omissions, by express undertakings, then in all such agreements there must be both mutuality of obligation and remedy. Pomeroy on Contracts (Ed. 1897), sec. 169; Glass v. Rowe, 103 Mo. 513; Warren v. Castello, 109 Mo. 338; Jones v. Williams, 139 Mo. 87; Stanton v. Singleton, 126 Cal. 657; Cowan v. Curran, 216 Ill. 598; Liscomb v. Adams, 193 Mo. 546. (4) A court of equity will not decree specific performance of the contract because the wife did not join therein. The testimony shows that the plaintiff knew at the date of the contract that the defendant had a wife. The inference would be that the plaintiff intended to purchase only the interest of the defendant. The petition makes no averment or claim of reduction of purchase price on account of outstanding inchoate dower. There was no

fraud alleged or proven warranting a deduction on account of inchoate dower. The decree allowing a deduction on account of inchoate dower is therefore not warranted by the averments or the law. Riley v. Smith, 25 N. J. Eq. 158; Fraharty v. Blake (N. J.), 10 Atl. 158; Hawralty v. Warren, 18 N. J. Eq. 124; Peeley v. Levy, 26 N. J. Eq. 330; Clark v. Seirer, 7 Watts 107; Lucas v. Scott, 41 Oh. St. 636; Shoonmaker v. Bennie, 119 N. Y. 565; Sternberger v. McGovern, 56 N. Y. 12; Roos v. Lockwood, 66 Sup. Ct. (N. Y.) 181; Bonnet v. Babbage, 19 N. Y. Supp. 934; Riesz's App., 73 Pa. St. 485; Burk's App., 75 Pa. St. 141; Burk v. Serrill, 80 Pa. St. 413; Hill v. Jones, 152 Pa. St. 433; Weller v. Weyand, 2 Grant's Cas. 103; Richmond v. Robinson, 12 Mich. 193; Phillips v. Staunch, 20 Mich. 369; Yost v. Devault, 9 Iowa 60; Fortune v. Watkins, 94 N. C. 304; Graybill v. Brauch, 89 Va. 895; Cowan v. Kane, 211 Ill. 572. (5) The court can not measure the value of inchoate dower by mortuary tables. Besides, the petition is not framed for damages in compensation for defects, or in lieu of specific performance. Yost v. Devault, 9 Iowa 60; Cowan v. Kane, 211 Ill. 571; Kauffman v. Peacock, 115 Ill. 212; Millmore v. Murphy, 65 N. J. Eq. 767. (6) The testimony shows that on January 17, when the written contract upon which suit was brought was obtained from defendant, the plaintiff was acting as agent of defendant for the sale of the property under a written commission expiring January 20. And in the contract upon which suit is brought defendant agrees to pay plaintiff a commission for his services as agent in acting for defendant. Plaintiff confesses that when it obtained the contract sued upon, tendered the money, demanded the deed, executed the notes for the deferred payments, brought this suit, it was acting as agent for the "Brothers of Mary." This double agency would render the contract in suit voidable if not void, and unless intelligently and unequivocally ratified by defendant, the contract which was the

result of such double agency could not be specifically enforced. McElroy v. Maxwell, 101 Mo. 309; Marsh v. Buchan, 46 N. J. Eq. 595; Robinson v. Jarvis, 25 Mo. App. 421; Chapman v. Currie, 51 Mo. App. 45; Smith v. Carroll, 66 Mo. App. 8; Pomeroy's (Specf. Per. of) Contracts (2 Ed.), secs. 285-6-7; Lewis v. Walker, 61 Mo. App. 54; Louthman v. Stillwell, 73 Mo. 499; 26 Am. and Eng. Ency. Law (2 Ed.), 22; 1 Ib., 1073; Casey v. Donovan, 65 Mo. App. 561; Henninger v. Heald, 46 N. J. Eq. 431. (7) There was no ratification of this voidable contract pleaded. The testimony does not show a ratification. The most that can be said of defendant's knowledge of plaintiff's representation of the "Brothers of Mary" was that plaintiff was looking for a site for the "Brothers of Mary" and that the written contract was taken by the plaintiff for the "Brothers of Mary." With all of this knowledge defendant was not warranted in believing that plaintiff was actually enlisted in the interest of persons who were trying to get his property on the best terms possible and for the smallest possible amount. The ratification of the double agency required by the law in this case is that it must have been of the most unequivocal manner. It must have been by the defendant's free and intelligent consent. Marsh v. Buchan, 22 Atl. 128; Mercantile Ins. Co. v. Hope Ins. Co., 8 Mo. App. 408; Smith v. Tyler, 57 Mo. App. 668; Candy Co. v. Ins. Co., 41 Mo. App. 530; Meyer v. Winchett, 43 Wis. 246; Lynch v. O'Fallon, 23 Am. R. 458. (8) The fact that plaintiff was not to be paid for services by the "Brothers of Mary" does not any the less constitute them agents of the proposed purchaser, because agency can exist without remuneration. 1 Am. and Eng. Ency Law, 1060, 1070. (9) Looking at the paper writing as a contract of purchase and sale between plaintiff and defendant, under the facts of the case, it then constitutes an open attempt of the agent to purchase the prop-

erty of his principal, the specific performance of which contract no court of equity ought to enforce. Clark & Skyles on Agency, sec. 415 p. 932; McElroy v. Maxwell, 101 Mo. 308; Grumbly v. Webb, 44 Mo. 444; Rea v. Copeland, 47 Mo. 77; Murdock v. Miller, 94 Mo. 96; Chinnock v. Sainsbury, 30 L. J. (N. S.) 409; Flannigan v. Railroad, 7 Eq. Cas. (L. R.) 121; Hesse v. Brent, 6 De. G., M. & G. 623; Minor v. Ice Co., 93 Mich. 97; Fry on Specf. Perf. (3 Ed.) sec. 276, p. 175; Fish v. Lessor, 69 Ill. 400; Tyler v. Sanborn, 128 Ill. 136; Pomeroy's Eq. Juris. (1 Ed.), sec. 959; Pomeroy on Contracts (2 Ed.), 48; Gardner v. Ogden, 22 N. Y. 349; Veazie v. Williams, 49 U. S. 8; Dwight v. Blackmer, 57 Am. Dec. 133; North Balt. Bldg. Assn. v. Caldwell, 25 Md. 423; Moore v. Moore, 4 Sandf. Ch. 48; Sweet v. Jacocks, 6 Paige 355; Trice v. Comstock, 121 Fed. 620.

*Kortjohn & Kortjohn* for respondent.

(1) We, of course, do not deny the proposition that a contract which has not been completed is not binding on either of the parties thereto. But our contention is that this contract is strictly a unilateral one, because the appellant for a consideration agreed to convey his land, if the purchase price was paid or tendered to him within forty-five days. There was nothing for the respondent to do except to tender the money if he decided to purchase under the option. The mere fact that the contract was to be signed in triplicate can make no difference because, if the respondent had signed it, it would not have assumed any obligation whatever. Besides this, there can be no question that both the appellant and respondent looked upon it as a complete contract. (2) The law in this State is, that a unilateral contract for the sale of real estate will be specifically enforced if the person to be charged signed the same for a valuable consideration. Smith v. Wilson, 160 Mo. 157; Warren v. Costello, 109 Mo. 338; Mastin v. Grimes, 88 Mo. 478. (3) Respondent never

demanded of appellant that his wife should sign the deed before it would pay him the money. The tender made to appellant was unconditional. Respondent is willing, and always has been willing, to take such a title as appellant can convey. It was well aware of the fact that the court could make no decree against the appellant's wife, as she was neither a party to the contract, nor a party to the suit. But in Missouri, as well as in other jurisdictions, the rule is that a deduction may be made from the purchase price in a suit for specific performance, to the extent of the vendor's inability to perform his contract to convey free from liens and encumbrances. Rector v. Price, 1 Mo. 373. Before the decree in this case was entered, this honorable court decided the case of Kilpatrick v. Wiley, 197 Mo. 123. Relying on this authority, the court below made the decree deducting from the purchase price the value of Mrs. Spelbrink's inchoate right of dower. In its action in this respect, the trial court was supported by the following authorities: Springle's Heirs v. Shields, 17 Ala. 295; Hazelrig v. Hutson, 18 Ind. 481; Martin v. Merritt, 57 Ind. 34; Sanborn v. Nockin, 20 Minn. 178; Hession v. Linastruth, 96 Iowa 483. Our laws (Laws 1905, p. 139) provide that estates of dower shall be computed according to the Carlisle table of mortality. The table for a single life is set out on said page, and corresponds exactly with the table set out on page 113 of the record.

## IN BANC.

WOODSON, J.—Upon reargument and after due consideration, the opinion of WOODSON, J., delivered in Division No. 1, is adopted as the opinion of this court, except in the following matter:

Since counsel for respondent stated in open court that if the court should conclude that it was not entitled to a deduction of any sum from the purchase price of

the property on account of the existence of the inchoate right of dower of his wife therein, and that in that event it would be willing to accept the general warranty deed of Louis Spelbrink alone conveying to it said property without such a deduction, it is, therefore, ordered that the judgment be reversed and the cause remanded, with directions to the circuit court to require appellant alone to execute to respondent such a deed, upon the payment of the purchase price, according to the terms of the contract of sale, and in case he refuses to execute such deed, then the court is directed to enter a decree divesting him of all his right, title and interest in and to the land in question, and to decree and vest the same in respondent, as fully and perfectly as if appellant had conveyed to it the property by such a deed. And it is further ordered, adjudged and decreed that nothing herein shall be taken to mean or be construed to prevent the respondent from taking such legal action as may be proper to collect all damages, if any it had sustained or may hereafter sustain, by reason of the existence of said inchoate right of dower in said land.

Gantt, C. J., Burgess and Valliant, JJ., concur; Fox, Lamm and Graves, JJ., dissent; Lamm, J., in a separate opinion.

## IN DIVISION ONE.

WOODSON, J.—This action originated in the circuit court of St. Louis county, and has for its object the specific performance of a written contract for the sale of certain real estate located in said county, executed by the defendant in favor of the plaintiff, a corporation, agent.

The petition was in the usual form, stating the substance of the contract, a tender of consideration agreed upon, and ended with a prayer for a decree in con-

formity with the terms of the contract and a prayer for general relief.

The answer was, first, a general denial, second, that, on December 23, 1905, defendant constituted plaintiff, by written commission, his agent for the sale of the real estate described in the petition, which authority expired January 20, 1906; that during the existence of said authority, and on January 17th, plaintiff applied to defendant for the extension of said authority to sell the property for a period of forty-five days, and requested the defendant to come to plaintiff's office and sign a paper extending such authority; that defendant went to plaintiff's office and thereupon plaintiff produced the paper writing filed as an exhibit to plaintiff's petition and requested the defendant to sign it, and that, through its officers, plaintiff then and there represented to the defendant that said paper writing had the meaning and legal effect of extending plaintiff's authority to sell the property; that, believing said representations, defendant signed the paper; that prior to signing the said paper, upon reading the same, defendant noticed that the paper bound him to sell the property for $20,000; that thereupon defendant remonstrated with the plaintiff, and plaintiff, in order to induce defendant to sign the same, represented that it would procure $22,000 for said property if defendant would sign the paper and grant plaintiff an extension of authority to sell the property; that at the time defendant notified plaintiff that he would sign the same provided his wife would consent to sell the same for $20,000, but that his signature to the said paper was on condition that his wife would consent to sell the property for that price; that thereafter and after signing said paper he consulted his wife, who refused to consent that the property be sold for that price and refused to join in the sale of the said property at the price of $20,000; that defendant notified plaintiff of his wife's decision, and further notified plaintiff that

he elected to revoke the authority to sell said property as contained in said paper writing filed as an exhibit to plaintiff's petition, and thereupon returned to plaintiff the check which had been by plaintiff placed with the defendant as the consideration for the extension of the said authority.

Further answering, defendant averred that at the time the plaintiff was acting for him in the sale of said property, and without the knowledge and consent of the defendant, the plaintiff was also acting for an association or society known as the Brothers of Mary in endeavoring to purchase the said property for them, and that when the contract was signed by defendant the plaintiff was acting for the Brothers of Mary.

For another answer defendant averred that neither under the authority of December 23, 1905, nor the alleged contract under which this suit was brought, did plaintiff enter into any binding contract in writing with the Brothers of Mary for the sale or conveyance of said property, but that if such contract existed with the Brothers of Mary it was a mere verbal understanding which could not be enforced by the defendant.

The plaintiff met the answer with a general denial.

The case came on for trial before the court on June 28, 1906, and after hearing the testimony the ordinary decree of specific performance was entered on July 23, 1906, interlocutory in its nature; the parts thereof which concern us are as follows:

"It is further ordered, adjudged and decreed, that if the defendant is unable, or for any reason fails to procure the release to the plaintiff of his wife's inchoate dower right in said real estate, then the value of the said right shall be ascertained at a time to be fixed by this court, and deducted from the purchase price of the said real estate according to the terms of the said contract, dated January 17th, 1906, and the cash, as well as deferred payments, to be made by the

plaintiff shall in such case be proportionately reduced.

"It is further ordered, adjudged and decreed, that if the defendant fails or refuses before the 6th day of September, 1906, to execute and deliver unto the plaintiff such deed of conveyance of said real estate, clear of encumbrance and with release of inchoate right of dower as aforesaid, then the plaintiff and defendant shall appear in this court on the said 6th day of September, at 9:30 a. m. of that day, and in court and under its direction, exchange deeds, money and notes as hereinbefore required, and in case there shall be no release of the inchoate right of dower of defendant's wife, the court shall thereupon on said day or at some later day which may be designated therefor, hear the evidence upon and determine the value of the said inchoate dower interest and the amount of cash and notes to be paid and delivered by the plaintiff, in accordance with this decree. . . . ."

Afterwards, and on September 6th, a final decree was entered, parts of which, so far as material, are as follows:

"And the defendant then and there in open court refuses to convey the real estate described in the decree herein, entered on the 23rd day of July, A. D. 1906, and refuses to perform any of the matters and things required to be performed by him by said decree, and the court thereupon proceeds to hear evidence as to the value of the inchoate right of dower of the wife of the defendant. And the court being fully advised in the premises doth find from the evidence heretofore heard at the trial of this cause that the defendant will be sixty-four years old on the 9th day of December, A. D. 1906, and that the wife of the defendant will be fifty-nine years of age on the 10th day of January, A. D. 1907; and the court doth further find from the evidence, that the present value of the inchoate right of. dower of the wife of the defendant in the real estate in

said decree described is $1,089.60, and that the plaintiff is entitled to a credit of said sum on account of that part of the purchase money of said real estate which is payable in cash, by reason of the fact that said real estate is encumbered with said inchoate right of dower.''

In due time defendant filed his motion for a new trial, which was by the court overruled, and, after excepting to the ruling of the court, he timely appealed the cause to this court.

Plaintiff introduced evidence tending to prove that it was a corporation, duly organized and doing business in the city of St. Louis as a real estate agent; that prior to December 23, 1905, a representative of a religious organization of Belgium, known as the Brothers of Mary, called upon plaintiff with a view of purchasing real estate in St. Louis county; that after showing the Brothers other pieces of property they were shown the property in question, which seemed to be what they wanted; that plaintiff approached defendant and asked him what he asked for the property, and at the same time he was told that said religious organization was looking for a location, and that his property seemed to suit them, and plaintiff told him that they believed they could sell his property to that organization.

Defendant thereupon gave to plaintiff the following written authority to sell the property:

"St. Louis, Dec. 23rd, 1905.

"Aiple & Hemmelmann Real Estate Co., St. Louis, Mo.

"You are hereby requested to sell the following property in St. Louis county, being ninety and 9-100 acres on the west side of Denny Road, running through to Spoede Road, and bounded east by property of Schnieder and West End Park, and including everything on premises, excepting live stock, for the sum of twenty thousand on terms of one-third cash, balance 5

years at 5 per cent. interest, or all·cash, at the option of the purchaser.

"Will give warranty deed and perfect title, and for the services of Aiple & Hemmelmann Real Estate Company a commission of 5 per cent. for such sale.

"This authority to expire January 20th, 1906.

LOUIS SPELBRINK."

Defendant told plaintiff that he had been holding the property at $25,000, and asked plaintiff to try to get $22,000.

That on the 17th day of January, 1906, said representatives informed plaintiff that they would recommend to the parent organization in Belgium the purchase of defendant's property at the price of $20,000, but that they would have to get an option, as it would require six weeks to get a reply.

Thereupon, plaintiff communicated with defendant, and told him that the organization would purchase the property, if the parent organization in Belgium approved the purchase, but that in the meantime they would require an option to purchase the same for forty-five days. That defendant consented to give such an option for the consideration of $50, and then and there signed the option contract offered in evidence, which is in words and figures as follows:

"St. Louis, January 17th, 1906.

"This agreement made this 17th day of January, 1906, between Louis Spelbrink of the city of St. Louis, and State of Missouri, party of the first part, and Aiple & Hemmelmann Real Estate Company, agent, of the same place, party of the second part.

"Witnesseth, and whereas, the party of the first part, for and in consideration of the sum of fifty dollars, in hand paid by the party of the second part, the receipt of which is hereby acknowledged, does hereby give and grant to the party of the second part, the option, privilege and right of purchase for forty-five

days from this date, situated in the county of St. Louis, Missouri, to-wit:

"Ninety and 9-100 acres on the west side of Denny Road, running to Spoede Road, and bounded south by property of Schneider and West End Park, and including everything on the premises, excepting live stock, for the sum of twenty thousand dollars, payable in terms of one-third cash and the balance in three years at 5 per cent.

"Party of the first part hereby agrees and guarantees to deliver to party of second part, on payment of said purchase money, a warranty deed to said real estate, and that title to said land shall be perfect and free from all encumbrances, liens or adverse titles. Should the party of the second part, within said period of forty-five days, accept the proposition of the first party to sell said real estate, and agree to take the same at the price and on the terms aforesaid, and tender to the party of the first part the said sum of twenty thousand dollars, then the party of the first part hereby binds himself to execute to said party of the second part a good and sufficient deed of conveyance, as above for said real estate.

"In testimony, we, the parties hereto, have hereunto set our hands and seals in triplicate this 17th day of January, 1906.

"LOUIS SPELBRINK.   (Seal.)
———————————   (Seal.)

"I agree to pay Aiple & Hemmelmann R. E. Co. a commission of five per cent on consummation of above sale.

"LOUIS SPELBRINK.   (Seal.)"

The next step in the transaction was a letter written by defendant to plaintiff, but not dated or signed, and is as follows:

"Mess. Aiple & Hemmelmann Real Estate Co.,

"Dear Sir: Gentlemen, I herewith enclose to you your check for $50, of date January 17, 1906, payable to my order, as earnest money on my farm in St. Louis county. On examination of the agreement you give me is not signed by you or agent or otherwise, so it binds me, not you nor your man, hence it is not a valid agreement, and again my wife will not sign the deed, so there is no other alternative but to return your check."

Said letter was enclosed in an envelope, which bears the post mark, January 26th, 10:30 p. m. The check mentioned in said letter is that of plaintiff's, dated January 17, 1906, and drawn to the order of defendant, on the Third National Bank, St. Louis, Mo.

In answer to this communication, plaintiff sent to defendant the following letter:

"St. Louis, Jan. 27th, 1906.

"Louis Spelbrink, Esq., City:

"Dear Sir: We received this morning a communication on what appears to be the letterhead of the Louis Spelbrink Livery and Undertaking Company, which communication is neither dated nor signed, but which was enclosed in an envelope with the Post Office stamp 'January 26th, 1906, 10:30 p. m.'

"Inasmuch as our check for fifty dollars, given to you on January 17th 1906, in consideration for a forty-five day option on your ninety and 9-100 acres of land on the west side of Denny Road, was enclosed in the same envelope, we take it for granted that you wrote the letter, or that it was at least at your direction, and we therefore direct this answer to you.

"We herewith return to you the check which we gave you, and respectfully inform you that you will be held to the strict performance of your option agreement, dated January 17th, 1906.

"P. S. We enclose you a typewritten copy of the communication above referred to."

It seems that thereafter plaintiff and defendants had some conversation over the telephone, for on February 26th, 1906, it writes to defendant a letter which is in evidence and is as follows:

"St. Louis, Feb. 26th, 1906.

"Mr. Louis Spelbrink, No. 1317 Franklin Ave., City:

"Dear Sir: Referring to our telephone communication of to-day, will say that we are now ready to close the purchase of your farm property.

"Kindly let us know whether you desire to prepare the papers or whether we shall attend to this; also, whether you desire all cash or one-third cash and the balance secured by deed of trust on the property."

Thereafter, by letter dated February 28th, 1906, the defendant communicated with plaintiff as follows:

St. Louis, Mo. Feb. 28, 1906.

"Messrs. Aiple & Hemmelmann Real Estate Co.,

No. 622 Chestnut St., City.

"Gentlemen:

"As I wrote you on the 26th of January that so far as there was any contract or option to sell my farm to you for $20,000 was concerned, I notified you that the contract was neither binding on me nor you. It was never a contract at any rate, because never properly signed, hence I notified you that I had rescinded, and so notify you again that it is of no binding on me, and I now herewith enclose you your check, dated January 17, 1906, for $50, made payable to my order. As you will see I have made no attempt to collect the same.

"This must end the matter as far as I am concerned."

On March 1st, 1906, Albert J. Aiple, Theo Hemmelmann, Jr., and Henry Kortjohn went to Third National Bank and drew $20,000 in U. S. legal tender notes. Thereafter the said three persons called on the defendant at about 8:20 a. m. of March 1, 1906, tendered back the $50 check to him, which he refused to take. They told him that they had with them $20,000

in U. S. legal tender notes, which they would give him, in case he wanted all cash for said lot, and in that event they wanted him to sign the deed from Louis Spelbrink to the Very Reverend Joseph Hiss, Superior, etc., which is an ordinary warranty deed.

Defendant was also informed that if he wanted only one-third purchase price in cash, they were ready to close the option in that way, in which event they wanted defendant to sign the deed to Charles E. Clore, which is an ordinary warranty deed, and that they would deliver to him the deed of trust executed by Charles E. Clore, and the seven notes of Clore, telling him that the deed, in case defendant wanted only one-third cash, was made to Clore, and the deed of trust and notes given by Clore, because, if the conveyance was made to the Brothers of Mary, the deed of trust must be sent to Belgium for execution.

They offered to exhibit the deeds aforesaid and the money to Spelbrink so that he might suggest any changes that he wanted, but the defendant refused to look at them, saying that his wife would not sign the deed, and asking the parties to call on Mr. R. M. Nichols, who had authority to act for him.

Thereupon, on the same day, Hemmelmann and Kortjohn, with the money and all said papers, proceeded to Mr. Nichols's office and told him what had happened at Mr. Spelbrink's place, and offered to exhibit the papers to him. He said that he would waive the tender, and Hemmelmann and Kortjohn then left his office.

Thereupon, on Kortjohn's advice, respondent prepared a warranty deed from Louis Spelbrink and wife to "Aiple and Hemmelmann Real Estate Co., Agent," and made and executed a deed of trust from said company as agent to R. M. Nichols, trustee for Louis Spelbrink, and also executed seven notes, all of which papers were presented to Mr. Nichols by Henry Kort-

john on March 2nd, 1906, with an offer to produce the cash for one-third of the purchase money. Mr. Nichols again waived the tender, saying that no point would be made on that, and put his initials and the date on each of said papers.

Plaintiff also showed that the defendant was the owner in fee of the property in question. Plaintiff introduced evidence tending to show that the Carlisle mortality tables were the same as those expressed in the Session Laws of 1905; that under these tables Mrs. Spelbrink, who was fifty nine years old, would have an inchoate right of dower which the witness valued at $1,089.60; all of which testimony was objected to for the reasons stated.

It appeared in evidence at the trial that Mr. Spelbrink was a married man at the date of the contract in suit and that his wife at that date was of the age of 59 years and he of the age of 60.

The defendant then offered the following evidence:

An admission signed by Mr. Kortjohn, attorney for the plaintiff, which reads as follows:

"It is hereby stipulated and agreed that Mrs. Spelbrink, wife of the defendant, being absent by reason of her illness, if she were present, would testify that she refused to sign the deed to the property described in the petition, for the reason that she believed that the amount to be received by said conveyance would not be sufficient amount for said property, under the paper writing constituting plaintiff's Exhibit A to its petition, and that she did not refuse to sign by collusion with her husband, the defendant, or any other person, for the purpose of preventing a sale of the property, but plaintiff reserves the right to object to said testimony on account of the incompetency of witness and irrelevancy of her testimony."

"Mr. Kortjohn: We object to Mrs. Spelbrink as a witness, for the reason, she being the wife of the de-

Real Estate Co. v. Spelbrink.

fendant, her testimony is incompetent. We object to the testimony for the reason it is irrelevant and immaterial whether she wishes to sign or not and why she does.''

The objection was by the court sustained, and defendant duly excepted.

Over plaintiff's objections and exceptions, the defendant testified that at the time he signed the contract of sale he told plaintiff that he signed it subject to the approval of his wife; he also testified on direct and cross-examination that, when he notified his wife of the contract, she told him she would never sign the deed, because he was not getting one-half what the farm was worth; that she has at all times refused and still refuses to sign the deed, and that she so refused at her own instance, uninfluenced by him in any manner whatever.

Plaintiff in rebuttal introduced evidence tending to contradict the statement of defendant to the effect that he told plaintiff at the time he signed the contract that he did so subject to the approval of his wife.

I. The first reason assigned by the defendant for a reversal of the judgment is that the evidence shows that it was the intention of the parties that the optional contract executed by defendant, on January 17th, 1906, in favor of the plaintiff, was to be signed by both the plaintiff and defendant, and for that reason it was not binding upon him until signed by plaintiff.

We are unable to concur in that view of the evidence. The contract upon its face shows that it is nothing more nor less than an ordinary option given by Spelbrink to the plaintiff as ''agent'' to purchase the land within forty-five days from the date of the contract, upon certain terms and conditions.

The mere fact that the contract refers to the plaintiff as ''party of the second part'' has no more signification than if it had simply granted the option

direct to the Aiple & Hemmelmann Real Estate Company.

The contract is unilateral and does not purport to obligate plaintiff to purchase the land or to do any other thing. Even the $50 consideration for the option, as expressed in the contract, was paid at the time by the plaintiff and receipted for. The plaintiff agreed to do nothing, and in that condition of things to hold, in the absence of positive evidence to the contrary, that it was the intention that it should sign the contract would convict both the plaintiff and defendant of solemnly contracting, in writing and under seal, to do a vain and foolish thing. No court would be warranted in placing any such a construction upon the contract in question. When we read the entire contract from beginning to end, it is perfectly manifest that plaintiff paid to defendant the sum of $50 for an option to purchase the land in question, at any time within forty-five days, upon the terms therein stated. The chief object in the interpretation of a contract is to get at the intention of the parties who made it. [Sedalia Brewing Co. v. Sedalia Water Works Co., 34 Mo. App. 49; Huse & Loomis Ice & Trans. Co. v. Heinze, 102 Mo. 245; Carter v. Arnold, 134 Mo. 195.] And, according to this rule, we must, therefore, decide this question against the defendant.

II. In this State it is no longer an open question that a court of equity will specifically enforce a unilateral written contract for the sale of land, based upon a valuable consideration. [Smith v. Wilson, 160 Mo. 657; Warren v. Castello, 109 Mo. 338; Mastin v. Grimes, 88 Mo. 478.] The contract in question comes within the purview of the rule just announced, and is therefore enforcible by a court of equity without there are facts and circumstances connected with and surrounding the transaction which would render it unjust and inequitable to do so.

III.   It is next contended by defendant that a court of equity will not decree specific performance of a contract against the husband where the wife refuses to join in the execution of the deed.

The evidence in this case discloses the fact that at the time of the execution of the contract the defendant was married, and that the plaintiff had knowledge of that fact.  Plaintiff testified and it stands uncontradicted that his wife at all times absolutely refused to join in the conveyance with him, and uninfluenced by him.  The contract provides that upon the payment of the purchase money the defendant will deliver to the plaintiff a warranty deed conveying unto it the said real estate clear of all encumbrances, liens or adverse titles.

The plaintiff does not contend or ask for a specific performance of the contract against the wife, she not being a party to the contract or suit, but it does contend that it is entitled to have the contract specifically enforced against the defendant, and that under his contract he be required to convey to it whatever title he owns and possesses in and to the land in question, and asks that the court ascertain and determine the present value of his wife's marital interests in and to the property, and deduct the amount thereof from the agreed purchase price, and that he be required to receive the balance thereof in full payment of his interest in the land, and that he execute and deliver to plaintiff a warranty deed conveying to it said land, free and clear of all encumbrances, excepting the inchoate right of dower of his wife in and to the same.

The contention of the defendant that a court of equity will not decree a specific performance of a contract for the sale of real estate against a husband where the wife refuses to join in the conveyance, is not sustained by the authorities in the broad and unqualified sense in which the proposition is stated by his learned counsel.  But the law seems to be well settled that if

the wife refuses to join in the conveyance of lands which her husband has sold, and there is no proof of fraud on the part of the husband in regard to her refusal, a court of equity will deny specific performance, and leave the purchaser to his remedy at law, without it further appears that he is willing to pay the full purchase money and accept a deed from the vendor alone, with covenants of warranty as broad as those called for in the contract.

In the discussion of this question the Supreme Court of New Jersey, in the case of Reilly v. Smith, 25 N. J. Eq. 1. c. 159, used this language: ''There is no proof, nor is there any allegation of fraud on the part of the husband in her refusal. On the other hand, it clearly appears from the testimony that she is actuated by considerations having reference to her own interests alone. The court will not, under such circumstances, compel her husband to procure a conveyance or release by her, or require him to furnish an indemnity against her dower. [Young v. Paul, 2 Stockt. 401; Hawralty v. Warren, 3 C. E. Green 124; Riesz's Appeal, 73 Pa. St. 485; Story's Eq. Jur., secs. 731-735.] Inasmuch as it does not appear that the complainant is willing to pay the full balance of the purchase money and accept a deed from Smith alone, a decree for specific performance must be refused, and the complainant be left to his remedy at law.''

And the same court, in the case of Flaharty v. Blake, 10 Atl. 158, said: ''In this case the husband said, at one time, that his wife was willing to join in the deed, but that she afterwards refused. The wife, however, says that she never consented; but, from the time she understood that her husband had made the sale, she refused to join in the deed. As the testimony stands, I cannot say that there is fraud. Specific performance will be decreed by the husband, with costs, but without indemnity.''

The reason for the foregoing rule is stated by the

Real Estate Co. v. Spelbrink.

same court in this language: ''A rule requiring him to do so would overthrow a wise statutory safeguard, designed to protect married women against coercive alienations. . . . . Besides, the complainant cannot say the refusal of the wife is an unexpected difficulty. He was aware there was risk to be incurred.'' [Peeler v. Levy, 26 N. J. Eq. l. c. 335-6.]

The Supreme Court of Pennsylvania, speaking through SHARSWOOD, J., stated the rule and the reason therefor in this language: ''But we consider the point as definitely settled in this State in the opinion of Chief Justice GIBSON in Clark v. Seirer, 7 Watts 107, recognized and affirmed as it has been in many subsequent cases: Riddlesberger v. Mentzer, 7 Watts 143; Shurtz v. Thomas, 8 Barr 363; Bitner v. Brough, 1 Jones 138; Hanna v. Phillips, 1 Grant 256; Weller v. Weyand, 2 Grant 103. These cases settle, if any amount of authority can settle anything, that in Pennsylvania specific performance of an agreement to sell real estate will not be decreed against a vendor who is a married man, and whose wife refuses to join in the conveyance, so as to bar her dower, unless, indeed, the vendee is willing to pay the full purchase money, and accept the deed of the vendor without his wife joining. The policy of these decisions is very manifest. The wife is not to be wrought upon by her love for her husband, and sympathy in his situation, to do that which her judgment disapproves as contrary to her interest; nor is he to be tempted to use undue means to procure her consent. The vendor must be left in such cases to his action at law to recover damages. . . . . The same sound policy which forbids a decree for the execution of a deed by the husband—to be enforced by his imprisonment if he cannot obey— prevents any decree looking to compensation, abatement or indemnity. The case does not fall within the principle of those decisions where the vendor who cannot make title to all he has contracted to convey, is held to be not thereby relieved from specific performance as

far as is in his power; but shall be compelled to execute his contract with a reasonable abatement in the price. The right of dower of the widow is of such a contingent nature, depending as it does as well upon her surviving her husband, as on her continuance in life after his death, that no abatement in the price can be made which will be just to both parties, without in effect making a new contract for them—a contract which, perhaps, in the first instance, neither party would have come into, certainly not the vendor. Receipt of the purchase money in full may have been the main object of the sale to enable him to pay debts or carry out other plans. If he is to be subjected to serious pecuniary loss by his wife's refusal to join, it will operate almost as powerfully as the peril of his imprisonment, as a moral coercion and compulsion upon her to yield her consent, instead of that free will and accord which the law jealously requires her to declare by an acknowledgment upon an examination before a magistrate, separate and apart from her husband.'' [Riesz's Appeal, 73 Pa. St. l. c. 490-1.]

In the case of Burk's Appeal, 75 Pa. St. l. c. 145-7, the evidence showed that the vendor agreed to convey the ''lands in fee simple, clear of all encumbrances,'' and it was suggested to him ''that his wife should also sign it. He replied in substance that it was unnecessary, as she was a woman who never meddled with his business. That she allowed him to do as he pleased in such matters, and would do whatever he should say.'' Afterwards, when he informed her what he had done, she thereupon declared ''she would not sign the deed, and has continued to persist in that refusal.'' The Supreme Court of Pennsylvania in that case said: ''The wife then has not said or done anything which compels her to unite in the fulfillment of her husband's contract. She has not executed and duly acknowledged any written instrument by which she is bound, as the wife had done in Dankel v. Hunter & Wife, 11 P. F. Smith 382.

Nothing less than that would bind her. [Glidden v. Strupler, 2 P. F. Smith 400.] The letter and the policy of the law forbid a wife to convey her interest in land otherwise than by the exercise of her own free and untrammeled will. A purchaser by contract from her husband must be presumed to know this essential requisite, and, therefore, that he takes the risk of the wife's uniting in the deed, or of his common-law right of action for damages against the husband. It may be answered that the appellee does not ask for a decree that the wife join in the deed; but only that one-third of the purchase money be retained to indemnify the vendee against her contingent claim, and that, therefore, her free will is not constrained. The specific performance of a contract in equity is of grace, not of right. It rests in the sound discretion of the chancellor. In an action . . . by a vendee against a vendor, to compel the specific performance of a contract for the sale of land, the plaintiff cannot recover, if the defendant be a married man and his wife refuses to sign the deed. . . . . Inasmuch, however, as upon the argument the counsel for the appellee expressed a desire to accept a deed from the appellant alone, rather than have no decree in his favor, we will send the case back in order that such decree may be made.''

When this case reached the trial court, in pursuance of the order before made, reversing it, the plaintiff, instead of having a decree entered against the defendant as directed by the court, resorted to an action at law to recover damages for the breach of the contract, and recovered a judgment against the defendant for $9,166.66, from which defendant appealed again to the Supreme Court. Upon the second appeal that court said: ''We then determined [referring to the former opinion], Justice MERCUR delivering the opinion of the court, that the specific execution thereof could not be decreed against the vendor, unless the vendee should be willing to pay the full amount of the purchase money

and accept the deed without the execution thereof by the wife. The reason given by us for this conclusion was that a court of equity would lend its aid to nothing tending, even remotely, to coerce a wife to relinquish the rights conferred upon her by the laws of the land. [Burk's Appeal, 25 P. F. Smith, 147.] Our statutes make very special provisions that she shall part with her dower in her husband's lands only upon her own free will and consent, and the magistrate before whom her acknowledgment is to be taken is charged to see to it that there has been no undue influence brought to bear upon her. If, however, her refusal to execute the deed is to suspend the payment to the husband of one-third of the purchase money during life, or to subject him to an action for exemplary damages, we can readily perceive that, in this manner, a coercive influence may be brought to bear upon her through her husband, which she may not be able to resist, and thus by indirection that may be effected which could not be accomplished by direct means. This method of compelling a wife to do what the law endeavors to protect her in not doing is something that the courts have long ago determined not to sanction."

The court then proceeded by saying: "The learned judge of the Common Pleas instructed the jury that they might find from all the evidence submitted to them that Burk fraudulently induced his wife to refuse to sign the deed, that he might in this manner escape from his own contract, and that if they so found, they might inflict damages upon him to an amount even exceeding the full value of the land. The result of this charge was a verdict of $9,166.66, though the amount actually paid by Serrill to Burk, on the contract, was but $50, and the actual incidental expenses, as testified to by Serrill himself, were so trifling that he did not think it worth his while to fix the amount. Of this instruction the defendant complains, and we think justly. There was no affirmative evidence whatever tending to show that

Burk had either directly or indirectly influenced his wife's action in the matter; on the other hand, he, his wife and Thomas Johnson swore positively that from the first she of her own accord refused to execute the deed. This should have settled the matter, and the jury should have been informed that they were to render a verdict for compensatory damages only. The fact upon which the court seemed to lay so much stress, that is, upon the lack of promptness in the defendant in informing Serrill that his wife had refused to sign the deed, of itself amounted to nothing. . . . . On the whole we cannot see that plaintiff is entitled to much sympathy in this matter. He knew that the wife's assent must be obtained or her right of dower could not be divested, and if he chose not to consult her, and thus run the risk of finally obtaining that assent, he has himself to blame if his success was not what he expected. That the husband said that his wife would do what he wanted her to do does not alter the case, for, without consulting her, he had no right to make any such engagement for her. However this may be, it is certain we cannot, in view of our statutes and decisions, permit the will of the wife to be coerced, through the pressure of heavy exemplary damages upon her husband, resulting from an assertion of her own undoubted right. The judgment is reversed and a *venire facias do novo* awarded." [Burk v. Serrill, 80 Pa. St. 1. c. 418-20.]

In discussing this same proposition, that great jurist, Chief Justice GIBSON, stated the law as follows: "It seems to be at last settled, on principles of policy and humanity, that equity stirs not to enforce a contract which involves in it a wife's volition in regard to her property; and it seems strange to us now that courts of chancery should ever have hesitated about it. Contrary to the benign spirit of the common law, the avowed purpose of contempt against the husband is to extort a conveyance from her through affection or fear. It would be a mockery to tell her she is free to act at

her pleasure, while the machinery of a court is put.in motion to constrain her by the strongest sympathies of her nature. The disposition evinced by chancellors, in other cases, to set married women free from restraints. imposed for their protection, and to hold them to the consequences of their acts performed notoriously under the influence or coercion of their husbands, is one of those things in respect to which the superior wisdom and fitness of the common law is vindicated by experience. I would not, were it practicable to avoid it,. expose the husband to imprisonment for a breach of the contract, even by an action; a fear of which, doubtless, serves to loosen the wife's hold on the property. But it is clear the contract will not be decreed on terms. that would jeopard his liberty. On the other hand, if the vendee consent to take such title as the husband can give him, it is agreed the coverture will not stand in the way of performance. But thus far entitling himself to it by performance of his own part, he must professedly go for no more. If he tender the price, demanding an entire execution of the contract, it may be rejected for having been tendered on a condition he is not entitled to enforce. Whether he may have an abatement of the price in compensation of the risk of dower left outstanding, is a question of the first impression; for the practice of giving specific execution without the wife's concurrence is but lately sanctioned; yet there are analogies which seem to show he may not. The doctrine of compensation has doubtless been carried very far; so far indeed as to compel the execution of a contract which the party had never made nor dreamed of. This was considered, in Drewe v. Hanson, 6 Ves. Ch. 675, to have been done, in the subdued tone of Lord ELDON, by 'the exercise of a strong power;' in plain terms, an arbitrary one. . . . . But other considerations press upon the mind when an untrammeled vendee comes before a chancellor for an exertion of his extraordinary power; an exertion grantable of grace, and not due of

right, to control the vendor's legal right to affirm the contract by performing it, or to disaffirm it by responding in damages on it; and this too on his own conditions. He insists that the vendor be driven to his securities for the purchase money, not as they were originally framed, but as he would have them were the bargain to be made over again; in other words, he comes to the chancellor to reform the contract, not to execute the practicable parts of it. I am unable to see the justice of that. If compensation be his aim, his remedy is an action for damages; nor, consistently with the principle that a man shall not affirm in part and disaffirm in part, do I see how he can have both performance and compensation. It was the opinion of Mr. Justice LIVINGSTON, in Hepburn v. Auld, 5 Cranch 279, that chancery cannot, in any case, compel specific performance on terms and conditions; or execute a contract in part, and assess damages for the residue; in which, however, he undoubtedly went too far. . . . . And here I concede, in the broadest terms, that it is fixed by a train of decisions which I need not specify, that even a vendee may enforce the contract in part, and extort compensation for a mistaken description *by which he was deceived*. But there is this redeeming qualification in the principle, that it gives not compensation for a defect which was obvious to the senses, or *one of which the vendee was in fact apprised*. . . . . Now what is the character of a purchase from a husband of his wife's dower or estate? 'The policy of the law,' said the same profound jurist, in Emery v. Wase, 8 Ves. Ch. 515, 'is that a wife is not to part with her property but by her own spontaneous and free will. If this was perfectly *res integra*, I should hesitate long before I would say the husband is to be understood to have gained her consent, and that the presumption is to be made that he obtained it before the bargain, to avoid all the fraud that might afterwards have been practiced to procure it. I would have hesitated long in following up that pre-

sumption, rather than the principle of the policy of the law; for if a man chooses to contract for the estate of a married woman, or, an estate subject to dower, *he knows the property is hers* altogether, or to a given extent. *The purchaser is bound to regard the policy of the law;* and what right has he to complain if she who, according to law, can part with her property but by her own free will, expressed at the time of the act of record, takes advantage of the *locus penitentiae;* and why is he not to take his chance of damages against the husband?' Now, when the object of an agreement is such as this has been described, so inconsistent with political morality that a chancellor will not enforce it, it is difficult to see anything in it to induce him to compensate the loss of it, or to touch it at all. If, in disregard of public policy, a purchaser has taken a covenant for a wife's title, let him, in the words of Lord ELDON, take his chances of damages for it; a chancellor should not move a finger for him; and if he has taken no covenant, is it not clear that he consented to take the husband's conveyance without even a chance of damages? But independent of positive demerit, it must be inferred, on the principles of Dyer v. Hargrave, 10 Ves. Ch. 505, that he estimated the difficulty of procuring her compliance, and bid so much the less. Besides, for a contingent liability such as this, the proper compensation is not abatement, but indemnity. [Milligan v. Cooke, 16 Ves. Ch. 12.]'' [Clark v. Seirer, 7 Watts (Pa.) 1. c. 110-112.]

And the Supreme Court of North Carolina said upon this subject: ''If the vendee knows that the vendor is a married man, he knows that his wife is entitled to dower, and that she cannot be compelled to release her dower right; and entering into the contract with such knowledge, he is not entitled, within the doctrine so well established, to ask anything more than the husband can give.'' [Fortune v. Watkins, 94 N. C. 1. c. 315.]

The Supreme Court of Ohio said: ''Passing by the question whether or not a contract to convey by warranty deed is equivalent to a contract to convey by such deed with release of dower, the purchaser asking for a conveyance by the husband with an abatement for the prospective dower of the wife, asks the court to do for him what he knew, at the time the contract was made, the purchaser would not have undertaken to do. If a contract to convey by warranty deed is equivalent to a contract to convey by such deed with release of dower by the wife, still a remedy which is not a matter of absolute right, but which is given only on equitable principles, should be denied to a party who asks for that for which his contract does not expressly provide, and which, if insisted on at the making of the contract, he then knew would not have been assented to by the other party.'' [Lucas v. Scott, 41 Ohio St. 1. c. 641.]

The Supreme Court of Illinois stated the law as follows: ''But in ordering the specific performance of a contract for the sale of land which does not fix a sum as liquidated damages for the failure of the wife to join in the deed, the chancellor has no power to provide for a deduction from the purchase money of any sum as the value of the inchoate right. . . . . The court, in considering the nature of an inchoate right of dower, in the case of Kauffman v. Peacock, 115 Ill. 212, said that whether it would ever become more than an expectancy would depend upon a fact which might never occur, that the wife should survive the husband and become entitled to dower; and that the inchoate right is not property which can be measured, and does not become property until the death of the husband. In attempting to support the decree, counsel say that a computation can be made upon the basis of the mortality tables. Such tables are used more from necessity than because they are a reliable guide in fixing the probable duration of any individual life, being mere averages of many lives, but we know of no table by which the value of an inchoate

right of dower can be approximately estimated. If Cowan were dead and his wife surviving, mortality tables might be used as the best means of determining the value of her dower, but as they are both living, the chancellor would have to base his estimate on the supposition that she was to be the survivor, and if that could be done in any case, there is no evidence whatever in this record upon which even a surmise could be founded. It would be carrying the use of mortality tables to an unwarranted extent to apply them in such a case to determine substantial rights. There was evidence tending to prove that Mrs. Cowan refused to sign the deed, and, if so, the court could only require the husband to convey and leave the purchaser to rely upon his covenants of warranty." [Cowan v. Kane, 211 Ill. l. c. 575-6.]

The same question came before the Supreme Court of Virginia, and that court stated the law in this language: "Specific execution of an agreement to sell and convey will not, ordinarily, be decreed against a vendor, a married man, whose wife refuses to join in the deed, where there is no proof of fraud on his part in her refusal, unless the purchaser is willing to pay the full purchase money and accept the deed without her joining." [Graybill v. Brugh, 89 Va. l. c. 899.]

The Court of Appeals of New York, in an able and well-considered case, said: "Under such a contract, to require the defendant to convey the Mott Haven property to the plaintiffs and pay such compensation as the court should determine its market value was impaired by the outstanding inchoate right of dower, or such sum as the real value of such right ascertained by the tables of mortality, would be harsh and oppressive. The defendant never made a contract to do this. . . . . These tables when applied to a great number of cases will, in the aggregate, show correct results; hence, they may be used by life insurance companies with safety in fixing their rates, and are resorted to by

the courts when the probable duration of life must be determined in adjusting the rights of parties. But to determine the value of the inchoate right of dower in this way, for the purpose of enforcing the specific performance of a contract for the exchange of real estate, with compensation, would be unsustained by precedents or sound principle." [Sternberger v. McGovern, 56 N. Y. l. c. 19-20.]

We have quoted quite extensively from a few of the many cases bearing upon the question under consideration, and they are in harmony with the overwhelming weight of authority in both this country and England.

We will now apply the law thus announced to the facts of this case. Defendant was a married man at the time he signed the contract of sale, and that fact was known to the officers of the plaintiff company. She of her own free will and accord refused from the time she first heard of the contract down to the date of the trial to join in the deed of conveyance with her husband. There is no evidence in this record which tends to show that he in any manner whatever induced her to withhold her signature from the deed, except the mere fact that he also refused to make the conveyance; from that fact it may be argued that it can be inferred that he or his conduct influenced her in her declination to join him in the conveyance. This is simply a circumstance in the case and not substantial evidence which the chancellor can place in the scales of justice, and say that it has sufficient weight to justify the finding that he was responsible for her conduct in the premises. It could be just as logically argued upon the other hand, that it was her declination which caused him to refuse to execute the deed. But if we correctly understand plaintiff's position, it does not lay much stress upon that contention; but under paragraph IV of its brief, it admits that it "is willing and always has been willing to take such a title as appellant can convey," and alleges that it

"never demanded of appellant that his wife should sign the deed before it would pay him the money." While it will be observed from this admission and declaration of plaintiff that it is willing to accept such a title as defendant alone can convey, and that it is willing to pay *"him the money,"* yet, it will be noticed that it did not offer to pay the *full contract price* for that title, but, upon the other hand, it refused to pay the entire purchase money therefor, and had the court find the supposed value of his wife's inchoate right of dower in and to the land, and to deduct that sum from the contract price. In other words, he had the court to deduct the sum of $1,089.60, the supposed value of the wife's inchoate right of dower, from $20,000.00, the purchase price of the land, and decree that the plaintiff pay to the defendant the balance of that sum, according to the terms of the original contract of sale, and to divest all of his right, title and interest in and to the land out of him, and to invest it into the plaintiff.

Can this be done? We think not. A court of chancery will not specifically enforce a contract for the sale of real estate against a married man where his wife refuses to join him in the conveyance, without the vendee is willing to pay the full amount of the purchase money and accept a deed from him, alone, and without his wife joining therein, containing the kind and character of covenants and agreements as are called for by the contract. The reason for this principle of equity is that such a court will not lend its aid, even indirectly or remotely, to coerce a wife to relinquish her inchoate right of dower in the face of the statute which expressly provides that the relinquishment of her dower rights shall be done as her own free act and deed. Besides this, dower has always been considered one of the wards of a court of chancery, and it has even extended its protecting hand to the estates of married women and minors. And if in the face of the statute and the equitable

principles mentioned, the court should withhold the payment of a considerable portion of the purchase money during the life of the wife, because she refused to join her husband in the conveyance, or to subject him to an action for exemplary damages, it would be substituting in its decree, coercion and oppression in lieu of justice, equity and good conscience, which have ever characterized its judgments; and it would be no stretch of the imagination to say, that the influence and effect thereof would weigh so heavily upon him that the indirect effect upon her would be so great as to amount to a moral coercion, and as a result thereof she would rather relinquish her dower rights than to see him thus punished on account of her said declination, and thereby deprive her of her free disposition of her marital interest in her husband's real estate.

There would be no justice or equity in such a decree, but, upon the other hand, it would amount to moral coercion and duress in so far as she is concerned, and if perpetrated upon her by an individual, that is, if he had secured a deed from her by such means, without the intervention of a court, a court of conscience would not hesitate one moment in releasing her from the fetters which bound her thereto. The law will not permit a person to acquire or retain the fruits of a contract obtained by such extortion. [Wilkerson v. Hood, 65 Mo. App. 491.]

And as said by this court in the case of Davis v. Luster, 64 Mo. l. c. 45, "But it has long been the habit of courts of equity to relieve parties from contracts made under the influence of threats, or of apprehensions not amounting to legal duress. Where a fraudulent advantage has been taken of the fears, the affections or the sensibilities of a party, equity will grant relief. Judge STORY says that circumstances of extreme necessity and distress of a party, though not accompanied by any direct restraint or duress, may so entirely overcome his free agency as to justify the court in set-

ting aside a contract made by him on account of some oppression or fraudulent advantage or imposition attendant upon it. In such case he has no free will, but stands *in vinculis*. [2 Story Eq. sec. 239.]'' So in this case, if we should decree specific performance of the contract, and suspend the payment of a portion of the purchase money during her life, we would thereby subject her to such coercion and distress as would in all probability compel her against her own free will to join in the conveyance rather than see her husband's property taken from him for a much less sum than that called for by the contract, and for less than it is actually worth. No court should do that which it will not tolerate individuals to do.

In addition to this, plaintiff knew Spelbrink was married and that his wife had dower rights in the land, and, notwithstanding that knowledge, it accepted the contract of sale signed by him alone, she not joining, with an agreement that he would convey the property by general warranty deed, clear of all encumbrances, etc., and for which plaintiff agreed to pay him $20,000. Now, by what authority has this or any other court the right or power to change the contract and compel him to convey the land to the vendee for the sum of $18,-910.40 instead of said $20,000? None whatever. If plaintiff insists upon the strict performance of its contract, let it tender the full contract price, due according to the terms thereof, and pray for a decree of court commanding the vendor to convey the land to it by general warranty deed, with the covenants of warranty called for by the contract, and thereby perform what it agreed to *in toto* and at the same time receive every jot and tittle called for by its contract. By thus accepting such a deed, the plaintiff would become the owner in fee of the land, absolutely secure in its possession and enjoyment, for all time to come, without perchance the wife should happen to survive her husband, and demand her dower in the premises; and, in that event, should

she evict the plaintiff and recover her interests in the land, then and not until then would there be a substantial breach of the covenants of warranty contained in the deed. [Durrett v. Piper, 58 Mo. 551; Wade v. Ashbrook, 78 Mo. 515; Walker v. Deaver, 79 Mo. 664.]

This would give a cause of action against his estate, and, as soon as the eviction occurred, the vendee could institute proceedings against his estate and recover the value of her dower interest, computed according to the mortuary tables adopted by the Legislature. [Rumsey v. Otis, 133 Mo. 85; Metcalf v. Smith, 40 Mo. 572.]

But if the plaintiff does not choose to accept Spelbrink's deed alone with the covenants called for by the contract, and take possession thereunder and hold the premises until evicted by his widow, then he has the perfect right to repudiate the entire contract at this time and sue him for a breach of the contract and recover compensatory damages. [Burk v. Serrill, 80 Pa. St. 413.]

And as was said by Lord ELDON in Emery v. Wase, 8 Ves. Ch. 515, and quoted with approval by Chief Justice GIBSON, in Clark v. Seirer, 7 Watts 112, "If, in disregard of public policy, a purchaser has taken a covenant for a wife's title, let him take his chance of damages for it; a chancellor should not move a finger for him; and if he has taken no covenant, is it not clear that he consented to take the husband's conveyance, without even a chance of damages? But independent of positive demerit, it must be inferred, on the principles of Dyer v. Hargrave, that he estimated the difficulty of procuring her compliance, and bid so much less."

It would be an almost endless task, as well as a supererogation of time and labor, to undertake to cite all the cases in this country which refer with approval to the remarks of Chief Justice GIBSON in Clark v. Seirer, supra. The principles announced therein are so firmly and universally settled on both sides of the

Atlantic that we are somewhat surprised to see them again questioned at this late day.

Such a contract, whenever it attempts to take the wife's right of dower under such circumstances, is not only against public policy and good morals, but is equally offensive to humanity—is oppressive and intolerable, and a court of chancery should do nothing whatever to extricate him from the unenviable position in which he has voluntarily placed himself in striving to grasp that which does not belong to him, nor which he is entitled to under his contract. All he is entitled to is compensatory damages against the husband for a breach of the contract, and the specific enforcement of the same against him without the reduction or suspension of any part of the purchase money. A court of conscience under the circumstances and facts of this case should give to plaintiff the pound of flesh called for by the bond, but should see to it that not one drop of blood is shed, as a *penalty* for the breach hereof. [Clark v. Seirer, 7 Watts l. c. 112; Burk's Appeal, 75 Pa. St. l. c. 146; Lucas v. Scott, 41 Ohio St. 636; Hanna v. Phillips, 1 Grant 254; Weller v. Weyand, 2 Grant 103.]

And this court has held that a specific performance will not be decreed in case of fraud, mistake or of hard and unconscionable bargains, or where the decree would produce injustice; and, generally, not in any case where such decree would be inequitable under all the circumstances. [Veth v. Gierth, 92 Mo. 97; Southworth v. Hopkins, 11 Mo. 331; Pomeroy v. Fullerton, 131 Mo. 581.]

This court has gone so far as to hold that, in a case where it was sought to specifically enforce a contract against husband and wife for the sale of real estate belonging to her, and signed by both of them, it was not only non-enforceable as to both of them, but also expressly held that a court of equity had no power or authority to enter judgment against him for part of

the purchase money paid to him, and have it declared a lien upon his curtesy in her land. [Gwin v. Smurr, 101 Mo. 1. c. 552.] If that is sound law, of which we have no doubt, then how much stronger is the reason for refusing to permit the plaintiff in the case at bar to deduct a portion of the purchase money said to represent her dower interest in his lands where she did not even sign the contract. It seems to us that it would be illogical to hold in one case that a court of equity has no power to bind the curtesy of the husband in the wife's land, where he has signed the contract with her, and hold in another that it can lay hold of her inchoate right of dower in his lands, and deduct the supposed value thereof from the purchase money when she never even signed the contract of sale with him, nor which has been paid for. Such rulings would be fish for one and fowl for the other. Such is not the law and should not be tolerated.

Nor are the suggestions heretofore made against the claim of plaintiff to have the payment of a portion of the purchase money suspended during the life of the wife the only valid reasons why such contention is untenable, but there is another equally strong and potent reason for denying such claim, and that is this: there is no possible way known to the law by which the value of the wife's inchoate right of dower can be ascertained. The plaintiff contends and was permitted to prove that value by the Carlisle Table of Mortality. This ruling of the court is attempted to be justified by an act of the Legislature, approved April 8th, 1905. [Laws 1905, p. 139.] This act refers in express terms to estate "for *life,* or by the *curtesy* or in *dower.*" This act is dealing with definite, known and ascertained estates, well known to the law, and it does not purport to, nor intend to include within its operations inchoate rights of dower, which is a vague, shadowy expectancy, without substance and intangible, and may never ripen into an estate *in dower* within the meaning of the act. To

apply this act to such an inchoate right might work the gravest injustice and hardship upon the vendor of real estate. As has been said by many of the courts of this country, such "tables when applied to a great number of cases will, in the aggregate, show correct results, hence they may be used by life insurance companies with safety in fixing their rates, and resorted to by the courts when the probable duration of life must be determined in adjusting the rights of parties. But to determine the value of the inchoate right of dower in this way for the purpose of enforcing the specific performance of a contract for the sale of real estate would be unsustained by precedents or sound principle." [Sternberger v. McGovern, 56 N. Y. l. c. 20.]

And as said by the Supreme Court of Illinois, "If Cowan [Spelbrink] were dead and his wife surviving, mortality tables might be used as the best evidence of determining the value of her dower, but as they are both living, the chancellor would have to base his estimate on the *supposition that she was to be the survivor,* and if that could be done in any case, there is no evidence whatever in this record upon which even a surmise could be founded. It would be carrying the use of mortality tables to an unwarranted extent to apply them in such a case to determine substantial rights." [Cowan v. Kane, 211 Ill. l. c. 576.]

In the light of these observations, let us apply the mortality tables to this case, and see what a hardship and great injustice might be imposed upon the defendant. Suppose the day after the affirmance, the wife of defendant should die—in that event plaintiff would never be called upon to pay the $1,089.60 deducted by the trial court as the value of her inchoate right from the purchase price of the land; and the same would be true, however long they both might live if she should happen to die first; and, if upon the other hand, they both should live for one or many years, and she should survive her husband, then plaintiffs would be compelled

to pay only $1,089.60, without interest, yet during all those years it would be in the full possession and enjoyment of the premises, as well as having the possession and use of the money free. Should all those events occur, the result would be that this court would sanction the taking of that sum of money out of the pocket of the defendant and turning it over to the plaintiff, without requiring the return of one penny therefor, and thereby reduce the contract price of the land from $20,000, the price fixed by the contract, to the sum of $18,910.40, the price fixed by the court. If the husband and wife were much younger, say twenty years of age, the sacrifice would be much greater, probably one-third of the value of their property would be tied up during their joint lives, however long that might be, and, ultimately, if perchance he should survive his wife, the entire sum would be forever lost to both.

Such a decree would be not only unjust, inequitable and unconscionable, but would border closely upon the line of confiscation of private property. A court of chancery should turn a deaf ear to so unjust and inequitable an appeal and raise not a finger in aid of such a monstrous proposition.

But it is insisted by plaintiff that the case of Kilpatrick v. Wiley, 197 Mo. l. c. 172, sustains the action of the trial court in deducting the $1,089.60 from the purchase money. As an abstract proposition of law that is true; but it will be noticed by reading that case that there was no such question in that *appeal*. No such issue was made by the pleadings, nor was any such point made in the briefs filed in the cause. It is perfectly apparent from reading the case as reported that brother LAMM, J., in reversing the judgment and remanding the cause for a new trial, was only stating in a general way the proper procedure in case certain facts should appear at the next trial. That part of the opinion was a general statement of the law upon spe-

cific performance of a contract for the sale of land, as will appear from the following quotation therefrom:

"There being no evidence on the condition of Lisle and Kilpatrick's title, and no satisfactory evidence on the question of the rental value of the land from year to year, and no evidence relating to the payment of taxes and insurance, this cause is reversed and remanded to hear evidence on the questions of title, rental values and the payment of taxes and insurance. If the title be found marketable, a decree must be entered that plaintiffs convey the real estate in question, free from all existing liens and encumbrances, to defendants Wiley and Dungan by warranty deed; or, in lieu thereof, that the title be vested out of plaintiffs and into Wiley and Dungan. If plaintiffs be married and their wives, or either of them, refuse to join in a conveyance, then testimony should be heard on their ages to ascertain by tables the present worth of their dower interests and, in that event, the purchase price should be diminished thereby, provided Wiley and Dungan are willing to accept specific performance in that form with compensation for outstanding dower."

It is thus seen that the expression was *obiter,* and has no binding force or effect as a precedent upon the court in this case.

Had the petition in this case charged and the evidence showed that the wife's refusal to join him in the deed of conveyance was caused by the fraud of Spelbrink, and not from her own volition, then a different proposition would be presented, and the conclusions might have been different from those here reached.

Returning, however, to the question under consideration, we desire to state, that if plaintiff feels aggrieved and injured by the defendant's breach of the contract, the courts of law are open to it, wherein it may prove and recover all compensatory damages sustained in consequence of such breach. Under the facts and circumstances of this case that is all plaintiff in

good conscience and equity should ask, or be permitted to recover in a court of justice.

IV. The defendant next insists that the trial court erred in deducting the value of the inchoate right of dower from the purchase price of the land, for the reason that no such question is presented in the pleadings. An examination of the pleadings discloses the fact that the petition was drawn upon the theory of enforcing the contract against defendant irrespective of the wife's interest in the land. No such question is presented, nor is any such relief prayed for in the bill. It is, therefore, clear the evidence as to the value of the wife's inchoate right of dower was foreign to the issues presented, and the decree in that regard is not responsive to or based upon the pleadings. This court has held that under similar pleadings the plaintiff was not entitled under the prayer for general relief to have even a money judgment entered for the damages sustained in consequence of a breach of the contract. [Rush v. Brown, 101 Mo. 586; Yost v. Devault, 9 Iowa l. c. 64.]

V. The defendant contends that the contract in question is null and void, for the reason that the plaintiff was the agent of both the vendor and the vendee in the sale of the land. While it is true plaintiff represented both parties in the transaction, yet all the evidence in the case discloses the fact that the defendant knew that fact. The very contract of sale signed by defendant states that the option was given to plaintiff as "*agent*," thereby indicating that it was acting for another. In addition to this, all the oral evidence conclusively shows that plaintiff fully disclosed to defendant in advance of all negotiations regarding the sale that he was acting for the Brothers of Mary. And the fact he had such knowledge is made clear by the following quotation from his letter to plaintiff, in which he returned the $50 check mentioned in evidence, to-wit: "On examination of the agreement you gave me is not

signed by you or agent, or otherwise, so it binds me not you, *nor your man,* hence it is not a valid agreement.'' When this letter is read in the light of the contract signed by defendant and the oral evidence introduced, there can be no doubt but what the words ''nor your man,'' contained in the letter, refer to the Brothers of Mary.

The mere fact that plaintiff paid defendant the $50 for the option was sufficient evidence to show him that it was also acting for the other party as ''agent,'' as stated in the contract.

The law is well settled in this State, as well as elsewhere, that where the dual agency is disclosed to the principals, the agent may act for both, and the agency cannot be questioned. [McElroy v. Maxwell, 101 Mo. l. c. 308; Alexander v. University, 57 Ind. 466; Rowe v. Stevens, 53 N. Y. 621; Scribner v. Collar, 40 Mich. 375; Morgan v. Elford, L. R. 4. Ch. Div. 352.]

We must, therefore, rule this proposition against defendant's contention.

VI.    There are some other subordinate questions presented by the record but they are necessarily disposed of by the rulings above.

We are, therefore, of the opinion that the judgment should be reversed and the cause remanded for a new trial, in conformity to the views herein expressed, and it is so ordered.

*Valliant, P. J.,* concurs; *Lamm* and *Graves, JJ.,* dissent in a separate opinion by *Lamm, J.*

## IN BANC.

### DISSENTING OPINION.

LAMM, J.—I agree to paragraphs one, two and five of the opinion by my brother Woodson, but not with his disposition of the question of dower in other paragraphs, nor with the reasoning upon which it is

put.   Some authorities sustain the conclusion announced; but, it is earnestly submitted, the main current of modern authority runs strongly and broadly the other way.

The question is:   May a vendee have specific performance of a contract for the conveyance of real estate, with abatement of price *pro tanto* for an outstanding inchoate dower right?

The proposition is of sharp concern to the business interests of the State, coming home to the fireside of the citizen and seeks a consideration commensurate, in fullness of depth and breadth, with its own gravity. The case at bar has the vantage ground of being a "seed-case," hence this court may be persuaded (but is unbound) by precedent.  Being free to take the view deemed soundest, it cannot be amiss to ponder well the course we set out on.  A choice at the forks of the road is one thing—to tread back on a journey is quite another.

It is true the conclusion reached runs contrary to the directions sent down in Kilpatrick v. Wiley, 197 Mo. l. c. 172-3.  In that case specific performance was decreed in favor of the purchasers, Wiley and Dungan (defendants), and, in reversing and remanding that case, the chancellor, *nisi*, was admonished as follows: "If plaintiffs be married and their wives, or either of them, refuse to join in a conveyance, then testimony should be heard on their ages to ascertain by tables the present worth of their dower interests and, in that event, the purchase price should be diminished thereby, provided Wiley and Dungan are willing to accept specific performance in that form with compensation for outstanding dower."  However, the doctrine was not discussed in the briefs in that case, nor by the writer, but the rule was laid down bare and bald as one announcing  recognized and well-grounded equity under a prayer for general relief, on the theory that in matter of equitable cognizance the chancellor should not halt

midway, but go on and administer rounded-out relief, surmounting all mere adventitious obstacles in his road. What was said, therefore, does not rise to the plane of exposition and doctrine and so, as aptly said by my brother, the point may be considered *res integra* in this jurisdiction.

It is not my understanding that it is an altogether open question, *nisi;* for in some circuit courts in Missouri, within my experience and observation at the bar, it has been the rule to enforce contracts for the sale and conveyance of real estate in favor of the vendee with compensation to him for outstanding dower rights, if he elect to take relief in that form, and if that rule is to be condemned it should be after we have gravely weighed the matter pro and con.

It has been said by some text-writers and held in some jurisdictions, that the question whether the vendee *knew* the vendor was married at the time he contracted is a vital one in settling relief. To my mind it is not clear that it should be taken as vital, and, in a line of well-considered cases, that element is ignored. But in determining the rights of a vendee under such a contract, there ought to be no difference of opinion on the fact, so long as the fact is at hand to be got at. Attending to that fact, in my brother's statement of the case it is set down fairly that the seller testified he told the buyer at the time of signing the contract that he signed it "subject to the approval of his wife." By inference, if the evidence be believed, this brought notice home to the vendee that the vendor was "under coverture"—we use the phrase advisedly as apposite to the present legal status of the husband. It is also set down in the statement fairly that the vendee in rebuttal put in evidence tending to contradict the vendor's in that behalf. Now, with the fact (at best) so put *in dubio,* by inadvertence it is assumed that the vendee *knew* the vendor was married at the contract time. For instance, in paragraph three is this: ''The evidence in this case discloses the

fact that at the time of the execution of the contract the defendant was married, *and that the plaintiff had knowledge of that fact."* Further along is this: "In addition to this plaintiff *knew Spelbrink was married and that his wife had dower rights in the land and notwithstanding that knowledge it accepted the contract of sale signed by him alone,* she not joining, with an agreement that he would convey the property by general warranty deed clear of all incumbrances," etc. In this condition of things it becomes pertinent to say that if the vendee's knowledge of the vendor's coverture be material, the fact should be fixed by record. Turning to that record, it appears that the palpable weight of the testimony is against the fact assumed. The chancellor would have been quite just in finding below that the vendee had no knowledge of the vendor's marriage at the time the contract was executed. It is true there is evidence that some days afterwards, Spelbrink communicated the information to the plaintiff by telephone of his wife's dissatisfaction. It seems he had a *post-contract* conversation with his spouse and learned of her dissatisfaction. It is further true that plaintiff, by its clerk, then sent the contract to Spelbrink's house to get the wife's signature. We infer on that mission he met Spelbrink alone. It seems the clerk was notified that Spelbrink considered there was no necessity to have the signature of his wife—that, "his *word* was good." It is within the record to say that the only evidence indicating the vendee's knowledge of the vendor's marriage at the time of executing the contract is the unsupported testimony of the vendor himself and that crept into the case sidewise. The matter arose in this way: He puts himself at the office of plaintiff in the presence of Mr. Gauss (a stenographer), of Mr. Hemmelmann (the plaintiff's vice-president), and a Mr. Aiple (who is dead), and while there the contract is prepared by Mr. Gauss and is about to be signed. At that moment this happens, according

to the record—Spelbrink being on the stand: ''Q. Now, at that conversation you say Mr. Hemmelmann and the typewriter were within from five to eight feet? A. Yes, sir. Q. And what did you say? A. I told him providing [meaning: I told him I would sign the contract providing] my wife was satisfied with the signing of that contract. Q. Was that all you said? A. That is about all.'' Such was his evidence in chief. He then signed the contract. Opposed to plaintiff's testimony, Mr. Hemmelmann testified he heard the conversation and that Spelbrink made no mention of his wife at all. Mr. Gauss testified the same way, and Mr. Hemmelmann further testified he did not know defendant was married and only knew him in a business way at the time the contract was executed.

With the oral evidence in this fix, the *improbability* of plaintiff's making the remark relating to the wife at the time of signing the contract, shown *aliunde,* should be put in the scale. For instance: In the first place, plaintiff corporation was a business concern. Its officers were seasoned and live business men and if such unusual remark had been seriously made, as defendant contends was made, it is highly unlikely they would have closed so important a transaction for their foreign clients with so singular and challenging a *condition subsequent* sought to be tacked on by parol, without either requiring defendant to settle the question whether his wife would come on or allow him to go on, or requiring her signature then and there. Here, if defendant is to be credited, were *two* minds meeting in a contract, and yet a *third* mind is projected by suggestion into the affair and then calmly (but not wisely) ignored by the suggestor, though by that lapse of prudence and omission of connubial fealty he laid himself wide open to be mulcted in damages if his wife held out at the end. In the second place, if defendant felt (as he would have us believe now) that it was his duty to consult his wife, or felt a call to advertise to plaintiff that his wife had

to be reckoned with as having a head of her own, and that he was a yielding and mellow yoke-fellow, his marital loyalty would naturally have found vent in consulting her in advance. He would not have signed the contract without ascertaining her state of mind, like a good husband should do. In the third place, the record shows that plaintiff and defendant had prolonged real estate negotiations finally consummated in the contract in suit. Though he and plaintiff had signed other contracts anent the sale, yet at no other place and at no other time during this business dealing did he think it necessary to take plaintiff into his confidence and proclaim that he had a wife or that he had to consult her. The chancellor, then, would have been right in finding, and presumably did find as a fact, that at the precise contract time the vendee had no knowledge the vendor was married.

In view of the foregoing, while, as said, I do not deem the vendee's knowledge of the vendor's coverture a turning or vital matter, yet the case ought to proceed on the theory there was no such knowledge at the contract's birth.

With this clearing away of underbrush, we come into the open and reach the main question.

I. The consideration of that question may be begun by reminding ourselves of the general equitable rules pertaining to specific performance. These rules assort themselves into questions of mere discretion and questions of right or power. It may be said that specific performance is somewhat of grace, i. e., the chancellor is entitled to exercise a discretion, he must seek equity and do it—not inequity—and, hence, specific performance will not go as of course and as a mere hard and fast matter of absolute right. However, as pointed out in Kirkpatrick v. Pease, 202 Mo. l. c. 493-4: "Discretion does not mean caprice. A discretion meas-

211 Sup.—46

ured by a capriciously elastic yardstick would present a false measure of equitable right. This discretion is spoken of in the books as 'a sound discretion'—*sound,* meaning judicial.'' It is a discretion governed by solid and settled rules and principles. It is one subject to review, and if the contract (as in this case) be fair, just and equitable the chancellor will use his extraordinary authority and decree specific performance. [Ivory v. Murphy, 36 Mo. l. c. 542.] This is so, because, as well put by VIRGIN, J., in Woodbury v. Gardner, 77 Me. l. c. 69: ''When a party to an agreement, fair and just in its terms, understandingly entered into and concluded, is injured, without default on his own part, by the non-fulfillment of the other party, the most direct and satisfactory remedy which he instinctively seeks is specific performance. This practical result he cannot obtain by the common law, for that measures all losses by money; but equity comes in to supply this more complete justice, and has laid down certain rules of relief by which, when its circumstances bring it within them, every contract susceptible of substantial enjoyment may be enforced.''

In short, it may be said that those fine rules of personal honor obtaining between man and man, requiring one man to keep his word with another, but accord with Justinian's golden idea of equity, viz., that every man should render to another his due.

Speaking of specific performance, Story says [2 Story Eq. Juris. (13 Ed.), sec. 779]: ''The general rule (for it is not universal) in such cases is, that the purchaser, if he chooses, is entitled to have the contract specifically performed as far as the vendor can perform it, and to have an abatement out of the purchase money or compensation for any deficiency in the title, quantity, quality, description, or other matters touching the estate.''

The general rule so formulated has been adopted and uniformly enforced in this State. Thus: In Luck-

ett v. Williamson, 31 Mo. l. c. 58, Scott, J., said: "Where the vendor has not substantially the whole interest he has contracted to sell he cannot enforce the contract against the purchaser [see in this connection, Greffet v. Willman, 114 Mo. 106] and yet the purchaser can insist on having all the vendor can convey with compensation for the difference." [Hart v. Handlin, 43 Mo. l. c. 175; McGhee v. Bell, 170 Mo. l. c. 133, *et seq.*, and cases cited.]

The case may proceed, then, with these two fundamental propositions assumed as solid, viz.:

(a) A purchaser of real estate under a contract such as here, that is, an honest one, a fair one, free from covin, overreaching, or misuse of trust relation—supported by a valid consideration, definite in term and not obnoxious to the Statute of Frauds—is entitled as of right to performance. The contracting parties write their own law in their contract. Courts sit to enforce the law. Hence they sit to enforce contracts—not abrogate them. [Evans v. Evans, 196 Mo. l. c. 23.]

(b) Being entitled to performance and defendant refusing to perform, such purchaser is entitled under clear equity to elect to accept that which was in the power of the vendor to give and further entitled to compensation for so much as the vendor had not in his power to give (in this case the inchoate dower right of his wife) unless there is something singular about the inchoate right of dower taking it out of the general rule and putting up the bars to full equitable relief, to-wit, performance in kind so far as possible with compensation for the part not performed.

In the evolution of the case the question then has come to be: Is there such peculiarity about the inchoate right of dower as strips the chancellor of power, or makes it inequitable to coerce performance on the husband's part by decreeing title out of him (if he refuse to convey) with compensation by proportionate abatement of the contract price?

As said, it would seem a negative answer is due that question.  And this because of the inherent good sense of the thing as well as the weight derivable from the sound exposition of text-writers and the reasoning of adjudicated cases.

It may at the outset be well to consider some of the cases leaned on as supporting a contrary view.  In some of them, notably from the Supreme Court of New Jersey, a distinction is made between a case where an element of fraud enters into the wife's refusal to join in the deed, and one in which fraud is absent.  In case of fraud it is held by that court, full relief may go. [Reilly v. Smith, 25 N. J. Eq. l. c. 159, and cases cited; Flaharty v. Blake, 10 Atl. 158.]  May it not be justly said of this theory that while fraud is a matter of ancient and modern equity cognizance, yet courts of law have jurisdiction in cases of fraud as well as courts of equity?  That one need not as a rule go into equity to cure fraud?  That specific performance, a distinct and independent ground of equitable cognizance, ought to require no aid from doctrines relating to fraud?  That it stands, to use a homely expression, on its own legs and may go because of the contract itself—absent fraud or present fraud in the vendor?  The equity of specific performance in favor of a vendee is not administered as a punishment for fraud in the vendor, but because of what is due the vendee, and is it not inconceivable that a vendor who refuses to perform through stubbornness—through loose ideas of the binding sacredness of a contract or (peradventure) because of the prick and itch of gain in a market rise—is any less amenable to the equitable rule because he does not also inject a darker element of fraud into his refusal?

In 1874 the Court of Appeals of New York decided Sternberger v. McGovern, 56 N. Y. 12.  On that learned bench at that time were seven judges.  GROVER, J., wrote the opinion, and what he said has been quoted in support of the notion that the purchase price should

not be abated by the value of an outstanding dower right. But it is a misapprehension to put the plenary authority of the Court of Appeals of New York behind what was said by Judge GROVER; for only two of the judges concurred in his remarks. One judge, RAPALLO, was absent. Two judges, CHURCH and ANDREWS, did not vote and another, ALLEN, concurred in the result upon the peculiar circumstances of the case—one of an exchange of properties. ALLEN, J., concurred in the result in this way: "ALLEN, J., concurs in the result upon the peculiar circumstances of the case, without passing upon the question whether specific performance with money compensation for inchoate right of dower may not be ordered in cases of exchange as well as upon a contract for the purchase of real property." Hence what was said by the deciding judge in relation to the use of life tables in cases of this character and what was said by him in relation to such abatement of price as might be got at by the use of such tables, must be taken with at least two grains of allowance, viz.: the state of the law at that time on the use of life tables, and the fact that a majority of that learned bench did not agree with him.

In a later New York case in which all seven judges concurred, Bostwick v. Beach, 103 N. Y. 414, the dower right of a widow was involved in a case of specific performance and that court found no difficulty with the matter, disposing of it in this way: "As to the dower right of the widow, a more complicated question is presented. If the purchaser should elect to carry out his purchase and take title to the land, subject to that dower right, he would clearly be entitled to do so, and in that event would be entitled to an abatement from the contract price, equal to the gross cash value of the right of dower. If a seller of land is not able to comply fully with the contract, either in respect of the quantity of the land or the extent of the estate, the court will, at the election of the buyer, decree specific

performance of the contract, so far as the same can be performed, awarding compensation to the purchaser by way of abatement from the purchase price, for any deficiency in title, quantity of land, or other matters touching the estate, the value of which are capable of being ascertained and thus compensated without doing injustice to either party. Upon this principle specific performance has been decreed where there was an outstanding dower right which the vendor could not control, and the purchaser elected to take, subject to that incumbrance. The gross value of the dower right has been adjudged in such cases to be the measure of compensation to be allowed to the purchaser by way of abatement from the price.'' Bostwick v. Beach was decided on the strength of the doctrine of Massachusetts courts, presently to be referred to.

In view of the foregoing later utterance of the highest court in New York we ought not without hesitation and caution to either base our own determination of the matter upon, or fortify it by, the *dictum* of GROVER, J., in the Sternberger case.

It may be admitted that the Supreme Courts of Ohio, North Carolina, Illinois and Pennslyvania sustain the doctrine announced by my brother. The Pennsylvania cases (Clark v. Seirer, 7 Watts 1. c. 110-112, and Riesz's Appeal, 73 Pa. St. 1. c. 490), quoted from *in extenso* by him, bear the hall-mark of oracles of the law—GIBSON and SHARSWOOD. What is said by Chief Justice GIBSON in Clark v. Seirer, *supra,* is written by a trenchant and characteristic pen, and what is said by SHARSWOOD bears the ear-marks of his elegant and ripe learning, but it is modestly submitted with confidence that the gist of what was said by GIBSON, C. J., is in the main leveled at using the power of a court of equity to coerce a conveyance from the wife by using contempt process against the husband whereby her affections may be played upon and her will broken. No one at this late day in the light of modern equity jurispru-

dence would assert that a court of equity would decree specific performance by ordering the husband to produce a deed with his wife's signature by a certain time or be clapped into jail for a refusal. The Supreme Court of Wisconsin refused in terms to follow Clark v. Seirer, *supra*. See Wright v. Young, 6 Wis. l. c. 130, *infra*.

The reasons given by SHARSWOOD in Riesz's Appeal, *supra*, have been included in a note to the text of Pomeroy's Spec. Performance of Contracts (2 Ed.), top pages 526-7. Referring to the Pennsylvania rule, which is also the rule in some other states as hereinbefore pointed out, Pomeroy sharply and successfully challenged the reasoning of SHARSWOOD, J., and it will not be space misapplied to quote and adopt with approval what he has to say, viz.:

"It seems to be settled in some of the States as a general rule, whether the vendee knew of the wife's dower interest or not, that when a contract is made with the husband, and the wife refuses to release her dower, the vendee cannot have an abatement from the price if he obtains a specific performance; he must either abandon the contract, or obtain a conveyance of the husband's estate, and sue him at law for a breach of the contract, or else content himself with the legal remedy alone. The reasoning quoted in the note, by which this rule is supported, is certainly very unsatisfactory, and the argument by which a judge sitting in equity justifies a party in the breach of his contract, and throws the shield of his decision over the defaulting party alone, is in striking contrast with the utterances of those equity judges who have built up the system and developed its doctrines from the eternal principles of right and justice. In fact, all the grounds given by the learned judge [SHARSWOOD] against awarding compensation are utterly untenable. The argument that the court cannot make a new contract for the parties, would apply with exactly the same force

to every case in which an abatement from the price is decreed; and, notwithstanding his *assertion,* it is plain, upon the slightest examination, that the case is identical in principle and in its particulars with all those instances of partial failure or defect of title in which compensation is always given to the vendee. The particular difficulty in the way of ascertaining compensation alleged by the judge, is shown to be no difficulty at all by two distinct considerations. First, if the husband himself had procured his wife to refuse, for the purpose of defeating the contract, then, as will be seen in the following paragraphs, a specific performance, with compensation, will be decreed; but on the reasoning of the court, this could not be done, since the difficulty of fixing upon the amount of the abatement is just as great in the one case as in the other—the contingency existing in the latter instance as well as in the former. But, secondly—and this answer is overwhelmingly conclusive—it is conceded by the court that the vendee can sue at law and recover damages against the vendor for the breach of the contract. Now, in the action at law, *the damages must be assessed upon exactly the same basis as that upon which the abatement of the price would be ascertained in equity*—if not, the assessment would be mere conjecture. If the damages can be assessed at law, notwithstanding the contingency, then, upon the same principle, and with the same ease, the compensation can be ascertained in equity. A party is dismissed from a court of equity because the relief which he asks is said to be impossible; he goes to a court of law and obtains the very same relief, on the very same facts, and in the very same manner in which he asked to have it granted in equity. In truth, a court of equity, in awarding compensation, does not necessarily require that the basis upon which the amount is ascertained should give a result with absolute accuracy; it is enough if the result can be fixed with reasonable certainty. Now, by the aid of the life

tables, disclosing the probable life of the wife, the present value of her dower can be ascertained with perfect ease upon the supposition that she will survive her husband; and even if this should *possibly* be a little too large, the husband, who has entered into a contract which he cannot fulfill, is in no position to demand favor from the court, especially as the money will only be withheld for a time by the vendee, and will be paid at the expiration of the dower right by the death of the wife, whether she die before or after her husband.''

Our author gives the approval of his strong and discriminating pen to the right of specific performance on behalf of the vendee with compensation for an outstanding inchoate dower right, but says that, on principle, the relief ought to be limited to those cases in which the vendee did not know the vendor was married at the contract time. [Pom. on Spc. Per. sec. 461]. Good reason abounds against this modification of the rule, but the question may be reserved, since the facts of this case bring it within the general doctrine asserted by the author.

We come in the next paragraph to consider the state of the law on the main question as deduced from as painstaking an investigation of the decisions in our sister states and the doctrine of text writers, as the writer has at his disposal or ability to make.

II. Waterman lays down the rule with Pomeroy's qualification (Waterman on Specific Performance, sec. 511). He says: ''As a rule, where a person contracts for the purchase of real estate, supposing that the vendor can give him a clear title, and the wife of the vendor refuses to join her husband in the conveyance, the vendee may, at his option, decline to take a deed executed by the husband alone, and bring an action against him for breach of covenant; or the vendee may accept the deed as part performance and retain so much of the purchase money as shall be proportionate

to the outstanding contingent interest of the wife. If the purchaser, when he enters into a contract, knows that the vendor has a wife, he of course takes the chances of the wife's refusal to release her right of dower, and, in the latter event, if he insists on performance, he cannot justly claim, and will not be entitled to, anything more than a conveyance of the husband's estate."

The learned authors of the Am. and Eng. Ency. Law (2 Ed.), vol. 26, p. 83, say:

"Where a party has entered into a contract which he is only partially able to perform, he will not, as a rule, be permitted to plead his own incapacity in bar of all equitable relief, but performance of such portion as he is able to perform may be decreed, with pecuniary compensation for the residue, or an abatement of the purchase price as to that portion of the property which cannot be acquired. So where a husband has entered into a contract of sale, and his wife refuses to join in the deed for the extinguishment of her dower right, it has been held that performance by the husband may be decreed with compensation or abatement for the wife's dower interest, or indemnity may be required against loss by the wife's claim for dower."

The rule in Massachusetts is to the effect that specific performance will be decreed with compensation for an outstanding inchoate right of dower. [Park v. Johnson, 86 Mass. (4 Allen) 259; Woodbury v. Luddy, 96 Mass. (14 Allen) 1.] As already pointed out, these two cases were cited with approval by the Court of Appeals of New York in Bostwick v. Beach, *supra,* and hence met the concurrence of the New York court. In the Park case, DEWEY, J., said: "As to the objection that the court will not decree a specific performance of the agreement so far as relates to the release of dower by the wife of the defendant, if the prayer of the bill is that the wife shall execute such release, it would of course be denied, she not being

a party to this contract, nor under any obliga-
tion to execute such release. [Squire v. Harder, 1
Paige Ch. 494.] But this will not prevent the court
from compelling the defendant to execute the contract
on his part, so far as it is personal to him, and also
charging him in damages for the inability to execute
his agreement in that respect. The plaintiff will there-
fore be entitled to a decree in his favor, requiring the
defendant to execute the contract on his part, the plain-
tiff also performing the stipulations on his part, in-
cluding the oral stipulation; and that upon failure to
procure the release of dower by the wife of the defend-
ant, proper damages be assessed therefor against him,
and that the case be referred to a master to report
as to the same.''

In the Woodbury case, involving outstanding
dower, HOAR, J., said: 'The general rule undoubtedly
is, that when a person can only partially perform a
contract into which he has entered, he must respond in
damages to the extent of the difference in value be-
tween that which the other party receives and that to
which the contract entitled him. And this is found by
taking the market value of what is delivered, and de-
ducting it from the market value of the whole subject
of the contract. [Wetherbee v. Bennett, 2 Allen 428.]
But this rule is not universal; and, in the case of an in-
cumbrance on an estate conveyed with covenants of
warranty, the more usual measure of damages for the
breach of the covenant against incumbrances has been
the market value of the incumbrance, where this was
capable of an exact estimate. [Estabrook v. Hapgood,
10 Mass. 315.] But under the peculiar relation of the
parties, we can have no doubt that the latter rule is
the just one. The plaintiff seeks the aid of a court of
equity to compel the specific performance of the de-
fendant's contract to convey land. The defendant is
unable to make a perfect title; and the court, at the
plaintiff's election, will compel the conveyance of so

much as the defendant can convey, and will award compensation in the nature of damages for the deficiency. . . . . The plaintiff in effect elects to take satisfaction partly in land and partly in money; and if he is allowed to do this he should only in equity be allowed to receive the fair money value of the part of the estate which is not conveyed to him. In the adjudged cases, though this is sometimes called damages, it is more usually spoken of as an equitable compensation for the value of that which the defendant does not convey."

In Iowa the question came before the Supreme Court of that State in Troutman v. Gowing, 16 Ia. 415. The court, *nisi*, in granting specific performance decreed one-third of the purchase money to be retained by the vendee as representing the value of the dower right until the wife should join in the deed. This was held erroneous and the cause was reversed with directions to the lower court to ascertain the value of the wife's interest either by a master or otherwise, so that in the light of testimony the court below should make the proper order to protect the rights of the respective litigants.

The question came before that court again in Leach v. Forney, 21 Ia. 271—Judge JOHN F. DILLON then sitting. It was there held that: "When the wife of the vendor refuses to join with her husband in the execution of sufficient deeds to enable him to perform on his part a contract for the conveyance of real estate, the vendee has the option of accepting performance by the husband to the extent of his liability, and the retention of so much of the purchase money as shall be proportionate to the utmost possible outstanding or contingent interest not conveyed, without interest; or to refuse such partial title and have his damages for a breach of the covenant."

In Zebley v. Sears, 38 Ia. 1. c. 509, it is said: "It is also settled that, under a contract to convey real estate

upon final payment of the purchase money, if the wife of the vendor refuses to join with her husband in the execution of a sufficient coveyance to enable him to perform his contract, the vendee may, at his option, refuse to take a deed executed by the vendor alone, and bring his action for a breach of the covenant, or he may accept such deed as part performance, and retain so much of the purchase money as shall be proportionate to the outstanding contingent interest of the wife.''

In Townsend v. Blanchard, 117 Ia. 36, that court reviewed its former decisions and in commenting upon a contention made, said: ''If the result of such holding was the making of a new contract for the parties, we would hesitate long before adopting it. But, as will be seen from a reading of the foregoing cases, this is not so. The contract, as made, is enforced in so far as it is possible; and courts do not permit defendants to take advantage of their own wrong. Purchasers are entitled to enforce their contracts in so far as possible, and at the same time have damages for non-performance of the entire contract.'' The doctrine was again affirmed in Bradford v. Smith, 123 Ia. 41, and in Thompson v. Colby, 127 Ia. 234.

The question came before the Supreme Court of Wisconsin in Wright v. Young, 6 Wis. 127, and in disposing of it Cole, J., considered many cases, English and American, including Clark v. Seirer, *supra* (refusing to follow its lead, p. 130), saying: ''We therefore conclude that in the present case, the vendee can enforce a performance of the contract, and take such a title as the vendor can give, and have an abatement of the purchase money for the right of dower left outstanding. Some question has been made as to whether the value of this dower interest could be accurately calculated. There can be no difficulty, however, in ascertaining what this reversionary interest is worth. In Davis and Peck's Mathematical Dictionary, and by Cyclopedia of Mathematical Science, pages 501 and 502, formulas are given by which the present value of

an annuity can be calculated which is to commence at the death of one individual and terminate at the death of another. In Emerson's Miscellanies, pp. 96 and 97, can be found a like formula. The interest of the wife in the estate sold being susceptible of calculation, we see no hardship in deducting the value thereof from the purchase money, if she is unwilling to relinquish her dower."

Wright v. Young was cited and followed in Conrad v. Schwamb, 53 Wis. 1. c. 378, and again in Docter v. Hellberg, 65 Wis. 1. c. 423. We take it that Wright v. Young settled the question in Wisconsin and announces the doctrine in that jurisdiction.

The same doctrine has the support of the Supreme Court of Minnesota in Drake v. Barton, 18 Minn. 462 (467); and in Sanborn v. Nockin, 20 Minn. 1. c. 186-7.

In some States, for example, in Maine, the equitable doctrine in hand has been grafted into the statutes. [Handy v. Rice, 57 Atl. 847.]

The rule in Massachusetts, Wisconsin, Iowa, Minnesota and New York is unreservedly adopted by the Supreme Court of Indiana and the Appellate Court of that State. [Wingate v. Hamilton, 7 Ind. 73; Hazelrig v. Hutson, 18 Ind. 481.] In the latter case the court, nisi, decreed the amount to be retained by the vendee was the full sum to which the wife would have been entitled if her husband had been dead. On this ruling it was said: "There should have been an inquiry as to the respective ages of the said husband and wife, etc., and the proper tables resorted to, to determine the question as to the amount which should be abated, and the correctness of the amount tendered, thereby determined."

In Martin v. Merritt, 57 Ind. 34, the question was reagitated and that court cited a long list of its former cases commencing with Wilson v. Brumfield, 8 Blackf. 146, and held that its doctrine was sustained by the weight of authority elsewhere. [Page 40-1]. See, also, Maris v. Masters, 31 Ind. App. 235.

The rule we are contending for is the doctrine of the Supreme Court of Michigan. In Walker v. Kelly, 91 Mich. l. c. 217, it is said: "It is insisted, however, that the contract is not enforcible, because the wife cannot be compelled to release her dower. There is no question but what the contract here was for a deed from both Kelly and wife, and, while the wife cannot be compelled to release her dower [citing Michigan cases], there is no reason why complainant may not have a decree for specific performance so far as defendant Kelly is concerned, and for compensation as to the dower interest of his wife . . . . There is no legal obstacle to the conveyance by a husband of his interest in real estate, and, if so, why may not the husband be compelled so to convey, when he has contracted so to do, and to give compensation wherein he has failed to perform his contract?"

The same rule seems to obtain in Alabama. [Springle's Heirs v. Shields, 17 Ala. 295.]

The importance of the question may possibly have justified pursuing the question so far. Such is the ingenuity of the human mind that a hard case may well be put against using life tables in computing the value of an inchoate dower right, but it is submitted that the same hard case can be put and used against any use of life tables as evidence. People do not live by a rule in mathematics. They die (and worms devour them) but not according to mathematical rule. Hence when a life table is used and the experience of mankind, derived from a close and wide observation in mortuary affairs, is thus made the aid and servant of judicial determination, the actual result may be wide of the mark, and register as a fact a thing that never would have happened. For example: A young widow has her dower commuted into cash under the statutory table—her expectancy produces a large sum—it is hers to keep and hers to give—and yet she may die in the twinkling of an eye. So that, her dower estate commuted on a long

expectancy of life if not commuted would have fallen in in a 'day. A case may be put of the same character against the use of life tables in any other form of litigation. And yet the use of such tables is constantly recognized in matters of dower, and is the policy of our written law. Their use is growing in other forms of litigation and no good reason can be assigned why they may not be used to ascertain the present worth of the inchoate right of dower. It is the best the law can do. The evidence is the best of which the case in its very nature is susceptible, and, hence, may be received and acted on. If trouble exists, shall the non-performing vendor alone have the advantage of them? Shall they be resolved alone in his behalf in equity?

Finally, unless we hold that specific performance may be decreed in equity with compensation or indemnity for outstanding dower we put it within the reach of (nay, we invite) any vendor at his own whim in every instance to clap the door of equity shut in the face of the vendee. To say the vendee shall take what the husband can give (which is less than he contracted to give) and yet pay the full purchase price for the whole title, amounts to no relief at all. The very statement of that proposition shows its inequity. He was entitled to a bird in hand—equity gives him one in the bush. He was entitled to bread—he gets a stone. He was entitled to the whole estate—equity says to him, pay all and take part.

Granted that equity will not coerce the wife, granted that she is a ward of chancery—that is the delight of the law to protect her dower; yet, in decreeing specific performance against the husband with compensation for her outstanding right of dower, her wifely interests in his real estate are not abated by the tithe of one hair. They go to her in due time and season undiminished.

The decree below should be affirmed. *Fox* and *Graves, JJ.,* concur.