# ALBERT T. JOHNSON, JR., Respondent, v. STEW-ART & HAY BUILDING COMPANY, Appellant.

### St. Louis Court of Appeals, February 4, 1913.

1. **PLEADING: Action on Contract: Sufficiency of Petition.** A petition, in an action on a contract, which pleads the general tenor and legal effect of the contract is sufficient.

2. **REAL ESTATE BROKERS: Action for Commission: Pleading: Variance.** In an action by a real estate broker for a commission for procuring a customer ready, willing and able to make an exchange of real estate pursuant to defendant's terms, *held* that there was no material variance between the contract for the exchange, which was pleaded in the petition according to its general tenor and legal effect, and the contract introduced in evidence, which entered into the details of the transaction much more fully than was set out in the petition.

3. ————: ————: **Sufficiency of Evidence.** In an action by a real estate broker for a commission for procuring a customer ready, able and willing to make an exchange of real estate in accordance with defendant's terms, evidence *held* to support a verdict for plaintiff.

4. ————: ————: **Failure of Wife to Sign Contract: Estoppel.** In an action by a real estate broker for a commission for procuring a customer ready, able and willing to make an exchange of real estate pursuant to defendant's terms, defendant could not defeat plaintiff's right of recovery by showing that the customer's wife did not sign the contract for the exchange, where, at the time the negotiations were terminated, such objection was not made and the refusal to consummate the exchange was placed upon other grounds.

5. ————: ————: **Verbal Contract with Customer.** In an action by a real estate broker for a commission for procuring a customer ready, able and willing to make an exchange of real estate pursuant to defendant's terms, it is not a prerequisite to a recovery that the customer enter into a written contract for the exchange, but it is sufficient if plaintiff procured a customer who was ready, able and willing to make the exchange on the terms proposed by defendant.

6. ————: ————: **Variation in Terms: Estoppel.** In an action by a real estate broker for a commission for procuring a customer ready, able and willing to make an exchange of real estate pursuant to defendant's terms, defendant could not defeat plain-

tiff's right of recovery on the ground that there was a mortgage on the real estate of the customer procured by plaintiff, where, at the time the negotiations were terminated, such objection was not made and the refusal to consummate the transaction was placed upon entirely different grounds.

7. ———: ———: ———. In an action by a real estate broker for a commission for procuring a customer ready, able and willing to make an exchange of real estate pursuant to defendant's terms, where it was shown that defendant at first insisted that he would not take in exchange real estate which was subject to a mortgage, but that he subsequently agreed to do so, and plaintiff then procured a customer who was ready, able and willing to make an exchange, subject to a mortgage, plaintiff's right to a commission could not be defeated by reason of the encumbrance.

8. INSTRUCTIONS: Ignoring Defense. An instruction which purports to cover the whole case and allows a verdict for plaintiff must not ignore matters of defense.

9. INSTRUCTIONS: Nondirection. In civil cases, mere nondirection is not a ground for granting a new trial.

10. INSTRUCTIONS: Refusal to Modify. In a civil action, a refusal of the court to correct its instruction by an addition to it is not erroneous unless the addition requested is correct, from a legal standpoint.

Appeal from St. Louis City Circuit Court.—*Hon. Edwin W. Lee,* Judge.

AFFIRMED.

*Barclay, Fauntleroy & Cullen* for appellant.

(1) Plaintiff having sued for the "performance of the contract," a recovery cannot be had for a breach of the contract of employment. Cosgrove v. Leonard, etc., Co., 175 Mo. 100. (2) "Exhibit 3" is a complete variance from respondent's alleged instructions, and from the terms of the proposed trade, which plaintiff alleges he accomplished, as stated in the petition. Green v. Cole, 127 Mo. 602; Laclede Co. v. Iron Works, 169 Mo. 138; Faulkner v. Faulkner, 73 Mo. 335; Jackson v. Badger, 35 Minn. 53. (3) We assert, as a rule

of law (a) that, under such a contract as "Exhibit 3" is, defendant was entitled, before plaintiff earned his commission, to a perfect title free from possible litigation, palpable defects, and from doubts, and consists of a title, both legal and equitable, free from any such admitted claim, such as Mrs. Eggmann has in that land. Campbell v. Harsh, 122 Pac. 127. (b) A broker is not entitled to commissions for a sale unless the contract procured by him is capable of specific performance at the suit of the vendee; a right to recover damages being insufficient. Webb v. Durrett, 136 S. W. 1189. The answer is, it cannot be done, and Exhibit 3 does not have the "drawing power" that it upon its face declares defendant was to have, nor what the petition declares on as having been accomplished by plaintiff. Aiple & Hemmelman Co. v. Spellbrink, 211 Mo. 671; Nesbitt v. Hilser, 49 Mo. 383. (4) The failure of plaintiff to obtain the wife's signature to "Exhibit 3" is fatal to any recovery in this case. Hughes & Thurman v. Todd, 146 S. W. 447; Aiple & Hemmelman Co. v. Spellbrink, 211 Mo. 671; 26 Am. & Eng. Ency. Law (2 Ed.), p. 98; Venator v. Swenson, 100 Iowa, 295; Railroad v. Adams, 62 N. J. Eq. 656; Clarke v. Reins, 12 Gratt. (Va.) 98; Sternberger v. McGowan, 56 N. W. 19; Bonnett v. Babbage, 19 N. Y. Supp. 934. (5) In a suit by the vendor to enforce performance of a contract for the sale of land, the vendee will not be compelled to accept the title unless it is a marketable one; that is, one which will not expose him to litigation. 36 Cyc. 632. (6) The contract must be one that defendant can enforce, upon the terms he authorized the agent to sell on. Walters v. Daney, 122 N. W. 430, 23 S. Dak. 481. (7) The court erred in giving plaintiff's instruction. That instruction premitted plaintiff to recover: (a) Even though the wife did not sign Exhibit 3; (b) Even though defendant had specially instructed Johnson that defendant would

not make the trade unless the farm was "free and clear," but, to the contrary, told the jury that even though there was a $5000 mortgage on the property yet plaintiff could recover; (c) It allowed a recovery even though the "event, such exchange" was not made and never transpired, yet a recovery could be had, whereas the petition says in "the event such exchange should be made" alone, would the plaintiff be entitled to his pay, and which confessedly defendant never made; (d) This instruction allows a recovery, if the jury shall find that on January 11, 1909, plaintiff presented to defendant "a contract," as is therein described, even though that contract, "Exhibit 3," might as it actually did, contain additional and different terms, conditions and requirements, which are not stated in the petition, or in the evidence of plaintiff, and which imposed burdens and changes of obligation upon defendant, which it had never authorized or agreed to. Exhibit 3 is not the contract upon which Johnson acted, or was authorized to act, nor is it the same, in terms or conditions, as is set forth in the petition. Before plaintiff is entitled to his pay, the performance must be upon the identical terms of agency, and, even though the agent may get better terms, yet the principal is not bound thereby. Nesbitt v. Helser, 49 Mo. 383.

*Sullivan & Wallace* and *Henderson, Marshall & Becker* for respondent.

(1) The rule of law is settled (and recognized in the defendant's second instruction given) that an agent's commissions are earned when he produces a customer ready, able and willing to take the property upon the terms proposed by the owner. Ballentine v. Mercer, 130 Mo. App. 605. (2) The rule of law is equally well settled that an owner cannot avoid paying commissions by a refusal to consummate the sale or by voluntarily disabling himself from performance. Reiger v. Merrill, 125 Mo. App. 541.

REYNOLDS, P. J.—Action by plaintiff against the defendant, a corporation to recover $1000 claimed to be due plaintiff by defendant for services rendered in connection with the attempted exchange of property of defendant for other property. It is averred in the petition that plaintiff, being a real estate agent, and defendant a corporation, and the latter, on and prior to the 11th of January, 1909, being the owner of a certain parcel of ground in the city of St. Louis, on which was located four certain flats or buildings, the whole covered by certain deeds of trust aggregating $24,000, and due in about two and one-half years from the 11th of January, 1909, with interest at the rate of six per cent per annum, payable semi-annually, desired to exchange this improved real estate, which, for brevity, we hereafter refer to as "flats," subject to these incumbrances for either farm property in this State or for vacant lots, and that for the purpose of effecting the exchange defendant had placed the matter in the hands of plaintiff and employed and directed him to procure for defendant such exchange, defendant agreeing to pay plaintiff for his services in that behalf the sum of $1000; that in pursuance of the employment and agreement, plaintiff entered upon the discharge of the duties thereby devolving on him and procured and offered to defendant sundry and various tracts and parcels of farm land in exchange or barter for the flats; that defendant failed and refused to accept any of these proposed exchanges until on or about December 5, 1908, when plaintiff submitted to defendant a written proposition from the owner thereof, one Tancred P. Eggmann, to trade a farm of 520 acres, situate in Phelps county, Missouri, subject to an incumbrance thereon of $5000 for the aforementioned flats, the latter to be taken subject to the $24,000 incumbrance mentioned; that defendant again agreed with plaintiff that in the event the exchange

was made defendant would pay plaintiff $1000 for his
services in that behalf; that defendant and the agent
of the owner of the farm visited and inspected the
farm at the cost of plaintiff and the agent of the
owner of the farm on the 11th of December, 1908 and
that thereafter Messrs. Stewart and Hay, officers and
agents of defendant, visited the farm on the 13th of
December, and after so doing entered into further ne-
gotiations for the exchange of these properties; that
these negotiations continued from time to time until
about the 7th of January, 1909, when the defendant
proposed and agreed to exchange its flats, subject to
the existing indebtedness thereon of $24,000, and sub-
ject to an additional incumbrance to be placed there-
on in the shape of four deeds of trust securing in the
aggregate $3000, making a total aggregate incumbrance
against the flats of $27,000, for the farm, the defendant
to take the farm subject to its incumbrance of $5000.
That thereafter the proposition of defendant for the
exchange of the properties was considered and dis-
cussed by the parties to the proposed exchange and
their agents   and the proposition of defendant was
finally accepted by Eggman, owner of the farm, on
the 11th of January, 1909, on which date plaintiff
presented to defendant "a contract for the exchange
of said properties according to the terms of the prop-
osition and agreement made by the defendant and ac-
cepted by" Eggman, which contract was dated on the
11th of January and duly signed and executed by Egg-
man, "and which contract was exactly in conformity
to the proposition of the defendant for the exchange
of said properties." Notwithstanding this, and not-
withstanding that plaintiff had procured and did offer
to defendant the written contract of the owner of the
farm for the exchange thereof for the four flats of
defendant, and notwithstanding the fact that Eggman
was ready, able and willing to make the exchange, it is
averred that defendant wrongfully refused to sign the

contract of exchange or to carry out the proposition for the exchange of the properties and still refuses so to do, and that notwithstanding plaintiff has in all things performed and carried out his part of the contract of employment defendant has failed and refused and still fails and refuses to pay plaintiff the $1000 agreed upon, or any part thereof, for his services in negotiating the exchange. Judgment is demanded for $1000 with interest and costs.

The answer, beyond admitting the incorporation of defendant, is a general denial.

The cause was tried before the court and a jury and resulted in a verdict and judgment for plaintiff for the full amount claimed. From this latter, filing its motion for a new trial and saving exception to that being overruled, defendant has duly appealed to this court.

Learned counsel for appellant make six assignments of error, which we will consider in their order.

It is assigned that the court erred in overruling the objection of appellant to the introduction of the contract for the exchange of the respective pieces of real estate. The objection made to the introduction of this contract is that it varies from the contract as pleaded. Consideration of that contract and comparison of it with the averments of the petition fail to support this assignment. It is true that the contract offered and admitted in evidence enters into details of the transaction much more fully than as set out in the petition; for instance, the contract provides specifically about delivery of possession of the respective properties, exchange of abstracts, who shall pay the cost of obtaining the abstracts, disposition of crops on the farm, etc. These are all matters of detail, however, and while important enough in the contract itself and possibly necessary and material when that contract came to be carried out, do not affect the general tenor of the contract between the parties. That

general tenor as well as the legal effect of the contract are correctly set out in the petition and that is sufficient. [Moore v. Mountcastle, 72 Mo. 605.] We find no material variance between the contract pleaded and the contract which was offered and introduced in evidence.

The second assignment of error is to the action of the trial court in refusing to give the instruction which was requested by appellant at the close of all the evidence, that the jury should find for defendant and against plaintiff in this case. Necessarily this involves an examination of the testimony.

The principal, in fact all the material testimony in the case was given by plaintiff in his own behalf, and by Messrs. Stewart and Hay in behalf of defendant. Messrs. Stewart and Hay were the officers of the corporation defendant who had acted for it in the matter, it appearing that they and their wives are the sole stockholders and members of defendant, the management of its affairs and business being in the hands of the husbands. It is said by counsel for appellant that "all the material evidence which was given by respondent in support of his claim was contradicted by the evidence of appellant, yet, inasmuch as the jury found in favor of respondent we will set forth his testimony at length as a statement of what his claims are, but which appellant insists does not entitle respondent, who was plaintiff below, to a recovery, and which does not support the verdict and judgment in this case." Those counsel have accordingly set this testimony out in full. Without repeating it in detail, we summarize it.

It appears that appellant was the owner of a certain lot or lots in the city of St. Louis, on which it had erected four flats. Title to this property was in appellant, subject to a deed of trust having about two and one-half years to run, the debt drawing six per cent interest, there being $6000 incumbrance upon each

of the flats, a total of $24,000. Defendant is in the general contracting business, apparently buying unimproved property and making a loan on it with the proceeds of which it made improvements. In all of the matters between plaintiff and defendant, the latter was represented by Messrs. Stewart and Hay; when we mention them we refer to them as representing defendant, now appellant, or when using the term "defendant" or "appellant," we refer to the acts of these gentlemen; when the word "they" is used, it usually applies to them as representing appellant. Mr. Hay appears to have approached respondent, who is a real estate agent, and told him that they were carrying more of this incumbered property, "more load," than they cared to, and wanted to exchange their city property for other property, preferably country property; and while they had several pieces of this incumbered property that they wanted to unload, and of which they gave a list to respondent, they called his attention particularly to these flats because, as respondent stated, they were considered better to trade on. Mr. Hay told respondent the rental, the size of the lots, the amount of the deeds of trust and particulars of the property, and on respondent asking him the valuation at which they wanted to exchange them, Mr. Hay stated that on the exchange basis they wanted $10,000 a set, that is, wanted to put the four flats in at $40,000; that there being an incumbrance of $24,000 on the building it made the equity worth $16,000. Respondent asked Mr. Hay if appellant was willing to assume an incumbrance on a farm or other properties. Mr. Hay said they would but they preferred unloading; that they considered they were "pretty well loaded up," and that their object was to "unload," and that the smaller the incumbrance the better they would be suited. After discussing the valuation at which the flats should be placed in any exchange propositions, respondent suggested a farm in St. Louis county which all parties

concluded they would go and look at. Mr. Hay then asked respondent what commission he expected in case an exchange was effected. Respondent testifies that they figured around a little and finally he told Mr. Hay that if he would put the flats on the $40,000 basis, the commission would be $1000, and respondent and Mr. Hay agreed that the property should be put on the basis of $40,000 valuation for trading purposes, although Hay insisted that that was the real value of the flats. The parties examined the St. Louis county farm and found it did not suit and that was turned down. As they were returning from the inspection of this farm, Messrs. Hay and Stewart said to respondent that they were in earnest about this proposition but that respondent could not get $1000 and "hand over that kind of a farm;" that appellant would like to pay respondent the $1000 all right but he would have to get "a decent farm." They told respondent to look around and get them another farm; that it did not have to be particularly close to St. Louis. Respondent afterwards submitted for consideration of appellant some vacant property in St. Louis, which was offered free and clear of incumbrance, for the equity in the flats. That proposition was turned down. Continuing his effort to find a suitable piece of property for exchange, respondent, about the first week of December, 1908, called Mr. Hay into his office and told him they were offered an exchange of a farm of 520 acres near St. James, Missouri, for the flats in the city, subject to the $24,000 incumbrance and that the agent who represented this farm claimed it was a $25,000 farm. Respondent suggested to Mr. Hay that to equalize the $20,000 equity, which the owner of the farm claimed, it would be necessary to increase the value of the equity of appellant; that they should put the flats in on a trade valuation at $44,000 instead of $40,000. Accordingly the valuation of the flats was raised to $44,000, making the equity of appellant in

them worth $20,000 to offset the value of the equity claimed to be in the farm. This was all explained by respondent, as he testifies, to Mr. Hay. Mr. Hay said that Mr. Stewart was from the section of the country where this farm was located and would possibly know a great deal about it; that he would talk to him about it, and that they had a man working for them who would undoubtedly know the farm. Subsequently respondent introduced Mr. Hay to the agent of the owner of the farm and an arrangement was made by which a salesman of the respondent, Mr. Hay and the agent of the owner of the farm went down and inspected it. In arranging for this inspection respondent and Mr. Hay had a conversation in which Hay called attention to the fact that they had put the flats at $40,000 and that the respondent had raised them to $44,000 for the purpose of the trade and asked him (respondent) if they had to pay an extra commission on the $4000 added to the nominal value or trading value of the property. Respondent said, "No," that the contract called for $1000 as his commission and even if the property was put at $100,000 he was to be paid only $1000 as his commission. That was agreed to. Whereupon Mr. Hay and the other two gentlemen referred to went down and inspected the farm. On their return from there Mr. Hay announced himself satisfied with the farm. He said that he and his associate Stewart would go down and look it over. Respondent offered to go with them or send a representative. Hay said, "No," that they did not desire respondent or anyone representing him to go with them; that they wanted to look at it for themselves. After they returned from a visit to the farm respondent called up Messrs. Hay and Stewart on the telephone and asked them about the situation. They said Mr. Hay would call on respondent. Accordingly Mr. Hay went to respondent's office and told him they had not yet arrived at a conclusion as to what they would do but he thought that

about the best they could do would be to exchange the flats of appellant, subject to the incumbrance of $24,000, for the farm free and clear of incumbrance. Respondent said to Mr. Hay that it was hardly probable that the owner of the farm could do that or that he would "have $5000 cash laying around," to which Hay said, "Well, of course, we would be perfectly willing to assume that $5000 and let us take his second deed of trust for the $5000 on the flats." A few days afterwards respondent received a letter from appellant contining a proposition as to the trade but what that proposition was is not in evidence. It was not accepted. Some days afterwards respondent told Mr. Hay that the agent of Eggman, owner of the farm, had made a counter-proposition, to the effect that Eggmann was willing to exchange the farm subject to the $5000, for the flats subject to $24,000, and in addition give back a second deed of trust for $500 on each set of flats; that is for $1000. That proposition was rejected by appellant and it made a modified proposition to the effect that appellant would take the farm subject to the $5000 provided the owner of the farm would give a second deed of trust amounting to $4000 on the flats. Appellant finally reduced this to $3000 and the matter was again taken up with the agent of Eggmann until finally the parties agreed upon $750 as the amount of the second deed of trust on each of the four flats, a total of $3000. This understanding was reached after negotiations had apparently been abandoned between all parties. So that the final arrangement was that appellant would take the farm subject to the $5000, and Eggman take the flats subject to the $24,000 then on them and give a second deed of trust amounting to $3000, a total incumbrance on the flats of $27,000. This understanding arrived at, respondent made a draft of the proposed contract between Eggmann and the defendant corporation, took it to the home of Mr. Stewart or Mr. Hay, went over it with them, settled

on certain changes to be made, and Hr. Hay wrote out on a letterhead of the defendant company the proposed modifications. Respondent then said to them. Hay and Stewart, "Now, gentlemen, do these represent the changes you want in that contract?" They said that they did. Respondent asked them whether, if these changes were inserted in a new draft of the contract, the balance would be all right, to which they answered, "Yes." Respondent then told them he would draw up a new contract accordingly, and asked them when they could sign it. They said they would come down to his office Monday afternoon, this occurring on Saturday, and would sign it, both Hay and Stewart insisting that they wanted the deal carried through as quickly as possible. Respondent took the paper and redrafted it in accordance with these suggestions, sent it over to East St. Louis, had it signed by Eggmann, and notifying defendant of that fact, on Monday afternoon requested Hay and Stewart or one of them to call at his office that Monday afternoon and sign it up. This they agreed to do. Neither of them appearing at that time, respondent waited in his office until about six o'clock, when Mr. Stewart came in. Respondent told him that they had been waiting for him and had about given him up; that they had the contract all signed and had waited all that afternoon for him. He thereupon handed Stewart the contract which had been signed by Eggmann. Stewart read it, said that it was all right, except that the words 'good titles" should appear in place of "perfect titles," but on talking the matter over with respondent waived that. Respondent then said to him, "Well, sign it." Whereupon Mr. Stewart said, "Well, I'll tell you Mr. Johnson, it looks like if we make this deal we are going to get into trouble." Respondent said, "What do you mean?" To which Stewart said, "Well, it appears that we will have two commissions to pay." Respondent asked him how that happened, when Stewart handed

him a special delivery letter which he said he had received from certain real estate agents, and told respondent to read it. In this letter these agents claimed to have had an understanding with appellant that the flats were in their hands for sale and that on any sale or exchange they were to have a commission of two and one-half per cent. Resepondent asked Mr. Stewart if he had an exclusive contract with these people and Stewart said, "No," and on Johnson telling him that these agents could not collect off of him even though he had signed an exclusive contract, Stewart said, "Well, another thing, Johnson, who is this Tancred P. Eggmann?" Respondent told him that he lived in East St. Louis, and on Stewart asking him if he knew him, respondent said he did not but knew that there was such a man because his (respondent's) agent had been over there that very afternoon and saw him sign the contract, and that Mr. Eggmann had then declared he was the owner of the farm. Respondent offered, if there was any doubt about it, to send over for Eggmann and have him come over. Stewart said that was what he wanted; he wanted to see this man and wanted to talk with him. It was arranged between respondent and Stewart that respondent would have Mr. Eggmann at his office the following day, which Stewart agreed to. Respondent thereupon made arrangements for Mr. Eggmann to be over at one o'clock the next day. At eleven o'clock of that day Mr. Stewart called up respondent and told him that he would not be down at one o'clock. Respondent told him he had made arrangements with Eggmann to meet him (Stewart) there at one o'clock; that Eggmann was a business man and that he (respondent) thought Stewart ought to make that apointment good and ought to keep it; that if he failed to do so it would put respondent in a bad position with Mr. Eggmann. Stewart replied, "We have concluded not to make the deal." Whereupon respondent said, "Stewart, this is rather

late in the day for you to make such a proposition as that. We have worked awful hard on this proposition for about six weeks. We have complied with every demand you made, got Eggmann to concede every point that you have demanded, and after the contract is signed by him and we have reported to Eggmann that those are the terms you would trade under, you turn it down." To which Stewart replied, "Well, we have concluded to let the deal drop." Respondent said, "Well, Stewart, if you have come to that conclusion, we have not, because I am out too much money and time on this thing. I have had every man in the office working on this thing for practically six weeks." Stewart then suggested to respondent whether he could conscientiously ask a customer of his to complete a deal when that customer felt in his own mind it was not the best proposition, to which respondent answered by a counter-question, to the effect that if Stewart was building a house for a customer and had followed out every specification that man made, and that man had permitted him to go ahead with the house, "until you had driven the last nail and then said to you, 'We don't want to take that house; we don't think it is the best thing for us to do,' what would you think?" To which Stewart said, "Well, of course, now, Johnson we don't want you to be out anything on this thing." Stewart then offered to reimburse respondent for his outlay, but that not being satisfactory and respondent insisting that he had carried out his arrangement and done all that was required of him to do in the matter and was entitled to his commission, after further talk over the matter of adjusting commissions, appellant, as respondent testified, "point blank refused" to go on with the exchange. This was the last conversation the parties had over the matter and these are the only reasons which were given at the time by appellant's representatives for refusing to consummate the deal.

This is practically the material testimony of respondent.

Our conclusion on it is that it was sufficient to take the case to the jury and to sustain the verdict, provided there was no error in refusing an instruction asked by appellant and refused, upon which refusal the third error is assigned.

The third error assigned is to the refusal of the court to instruct the jury to the effect that if they believed from the evidence that Eggmann, the man who signed the agreement of January 11, 1909, which was introduced in evidence by plaintiff, was a married man at the time that agreement was signed, they would return a verdict for defendant.

It is argued with great earnestness by the learned counsel for appellant that the failure to procure the signature of the wife of Eggman to the agreement, it appearing that he was a married man, was fatal to that agreement. In support of the contention as to the necessity of the signature of the wife to the contract, we are referred to the case of Aiple-Hemmellmann Real Estate Co. v. Spelbrink, 211 Mo. 671, 111 S. W. 480. That was an action having for its object the specific performance of a written contract for the sale of certain real estate. We do not consider it necessary to go into an examination of that case here. In the view we take of the case at bar, it is immaterial to determine whether the absence of the signature of the wife from the agreement rendered that agreement non-enforceable.

Referring to the point now made that the absence of the signature of the wife from the contract submitted to appellant is fatal to a recovery by respondent, this is to be noted: At the time of the transaction between the parties and when the representatives of defendant threw down the whole deal, no such reason for refusal to go on with the trade was advanced or suggested by appellant. We have set out all the rea-

sons then given. It may well be, as argued by counsel for respondent, that if such a suggestion had been made at the time, the signature of the wife could have been procured. There is no suggestion that she would not sign, when in the course of the trade deeds would have to be exchanged. So that it does not follow that if the contract had been signed by Eggmann himself and by the representatives of defendant, that the wife of Eggman would not have signed the deed. Failing to give this reason for refusing to sign the contract when asked to go on with it, appellant is now shut off from availing itself of it. In Thompson v. St. Charles County, 227 Mo. 220, l. c. 234, 126 S. W. 1040, it is pithily said that he who does not speak when he should, may not when he would. Among the many prior cases which have announced this same rule, see Morgan v. Mulhall, 214 Mo. 451, l. c. 464, 114 S. W. 4.

Unlike the Aiple-Hemmellmann case, this is not an action for a specific performance of a contract. It is an action to recover commissions claimed to be due and owing, the right to the commission based on the ground that defendant, appellant here, after respondent had performed his work up to the point of securing a customer ready, able and willing to go on with the exchange of the property on the terms upon which the employer of respondent had authorized, that employer, without legal excuse, had withdrawn from the trade and so prevented its consummation. It was not necessary to the conduct of the trade that the customer should have entered into a written agreement to make the exchange; a verbal agreement would have been sufficient up to the point of consummation of the transation: respondent had done all that was necessary when he secured a party who was ready, able and willing to go on with the trade; how that was evidenced, was, up to that point, immaterial; the customer had been secured; that the wife of that customer was not up to that point a party to the agreement, was imma-

terial. Right there the appellant stopped the trade and rendered all of the labors of the respondent futile. It would have been a useless proceeding for respondent then to have procured the signature of the wife to the agreement, if that signature was essential, and it would have been an idle act as well as one involving unnecessary expense for respondent to have procured a deed from the party and his wife and tendered this to appellant, for appellant had refused to go any further in the transaction.

It is assigned as error that the court refused to instruct the jury, at the instance of defendant, to the effect that if it believed from the evidence in the case that Stewart and Hay were not willing to take the farm in exchange for the flats because of the fact that there was a $5000 mortgage or deed of trust on the farm and that they so instructed Johnson in any trade he should try to effect, then their verdict should be for defendant. In connection with this assignment is the further one that as plaintiff's instruction, which purported to cover the whole case, omitted this element of it from the instruction that it was error. We consider both of these together.

It may be said as to this first ground as was said of the third assignment, that no such reason was given for the refusal to go on with the contract after it had been signed by Eggmann and when respondent had asked the representatives and agents of appellant to sign it. As we have seen, the refusal to sign—the breaking off of the negotiations—was placed upon an entirely different ground.

The instruction is furthermore subject to the very same criticism that counsel for appellant level against the first instruction given at the instance of respondent, namely, purporting to cover the whole case, it leaves out of view a very material element. Even granting that Stewart and Hay had instructed Johnson to the effect that in any trade he should try to

make, appellant was not willing to take the farm sub-ject to the mortgage, yet there is abundant evidence tending to show that, granting that such direction was given at the outset, appellant had, either by direct instruction, or by the whole course of conduct in the subsequent negotiations, receded from that direction. The evidence is very clear that one of the conditions of the exchange, as finally agreed upon, was the placing of a second deed of trust to the amount of $3000 on the flats. If the purpose of that was not to take care, to that extent, of the $5000 incumbrance on the farm, it is difficult to understand what purpose it could have. This instruction, as asked, should not have been given.

We do not think that the instruction given at the instance of respondent, plaintiff below, is subject to the criticism here made about it. It is true that an instruction which purports to cover the whole case and allows a verdict for the plaintiff must not ignore the matters of defense. We are cited by the learned counsel for apellant to a number of criminal cases in support of their contention, that the court should have covered both sides of a proposition. That is true in criminal cases, as see State v. Harris, 232 Mo. 317, l. c. 321, 134 S. W. 535. But the rule is not so in civil cases. In the latter, mere non-direction is not ground for a new trial. [Morgan v. Mulhall, supra, l. c. 462, *et seq.*] In that case it is said (l. c. 463), "That mere nondirection is not misdirection is a familiar, settled rule of appellate procedure. Under that rule, before appellant can predicate reversible error on what a trial court does not say to the jury, he must first put the court in the wrong by asking it to say something, or else the court in trying to cover the case by instructions holds a false voice, or omits in general instructions essential elements of the case." When a party, in a civil action, asks the court to correct its instruction by an addition to it, that addition must be a cor-

171 Mo. App.—36

rect proposition. Here, as we have seen, the addition asked was itself radically wrong.

This disposes of all the material assignments.

The judgment of the circuit court is affirmed. *Nortoni* and *Allen, JJ.,* concur.